## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                  CASE NO.  3:19-cr-191-MMH-JBT

SCOTT BALOTIN

_____

## O R D E R

**THIS CAUSE** is before the Court on Defendant Scott Balotin's Motion for New Trial (Doc. 621; Motion), filed on February 28, 2022.  Following a four-week jury trial, on October 18, 2021, the jury returned a verdict finding Scott Balotin guilty as to the charges in Counts One and Twelve of the Indictment (Doc. 1; Indictment).  See Verdict as to Scott Balotin (Doc. 522; Verdict).  Specifically, the jury found Balotin guilty of conspiring to commit health care fraud in violation of 18 U.S.C. § 1349 (Count One), and engaging in an illegal monetary transaction in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 2  (Count Twelve).  See id.; see also Indictment.  In the Motion, Balotin requests that the Court grant him a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure (Rule(s)).  See Motion at 1.  The Government filed a response in opposition to the Motion on March 18, 2022.  See United States Memorandum Opposing Defendant Scott Balotin's Motion for New Trial (Doc. 622; Response).

Balotin raises a variety of arguments in support of his request for a new trial.  See generally Motion.  First, he argues that the Court failed to properly instruct the jury.  See id. at 2-18.  Next, he contends that a new trial is warranted because his counsel must be given an opportunity to effectively cross-examine a government witness based on information disclosed after the trial.  See id. at 18-20.  Balotin also asserts that he is entitled to a new trial because the Government violated his Sixth Amendment right to be represented by counsel of his choice, Jose Baez, see id. at 20-28, and because the Court erred in denying his motion for mistrial, see id. at 28-30.  In addition, with respect to his conviction on the money laundering charge in Count Twelve, Balotin argues that a new trial is warranted because the charge in Count Twelve is based on the charge in Count One, and the verdict as to Count Twelve is contrary to the weight of the evidence.  See id. at 30-33.

Because of the fundamental importance of a criminal defendant's Sixth Amendment right to be represented by counsel of his choice, the Court will address Balotin's contention that the Government violated that Constitutional right before turning to the merits of his trial specific arguments.

## I.   Sixth Amendment Violation

### A. Briefing and Arguments

In the Motion, Balotin asserts that he is entitled to a new trial because the Government improperly restrained his family's assets that should have

been available to fund his defense and in doing so deprived him of his Sixth Amendment right to counsel of his choice. Id. at 20-28.[1]  In support, he argues that because the Government identified his real estate properties as "substitute assets" in its initial Bill of Particulars (Docs. 28, 139), and ultimately decided to pursue his assets as substitute assets at the conclusion of trial, see Second Amended Bill of Particulars (Doc. 484), the Government's filing of a lis pendens on the properties improperly restrained these assets which he needed to hire counsel in violation of Luis v. United States, 578 U.S. 5, 10 (2016).  Motion at 26-28.  With regard to Balotin's Sixth Amendment argument, the Government initially responded that

> Balotin was aware of the United States' investigation of him for several years before he was indicted, during which time he retained several attorneys. During the government's investigation, Balotin's properties were properly restrained. See, United States v. Monsanto, 491 U.S. 600, 109 S. Ct. 2657 (1989). Balotin now argues that the pre-trial seizure of those properties deprived him of hiring counsel of his choice. Because Balotin's properties were properly restrained, he was not entitled to sell them. Nonetheless, after being indicted, Balotin was able to hire Daniel Rashbaum, Esq., an experienced criminal defense attorney, who effectively represented Balotin throughout the trial.

Response at 6.

On May 18, 2022, after reviewing the Motion and the Response, the Court determined that additional briefing was warranted "[g]iven the

---

[1]      According to the Motion, title to seven of the eight restrained properties "is (and was) held by trusts of which Balotin's wife and or children are beneficiaries." Id. at 21.

important Sixth Amendment issues implicated by Balotin's argument that the Government impermissibly restrained untainted properties that he needed to fund his defense[.]" See Order (Doc. 646).  The Court directed the parties to file supplemental briefs and notified them that it would hold a hearing at which the parties could present oral argument. See generally id.[2] Specifically, the Court requested supplemental briefing as to the Sixth Amendment issue and directed the parties to address the following questions:

> (1) whether it was proper for the Government to file pretrial notices of lis pendens on Balotin's properties from November 14, 2019, until March 5, 2020, while it sought forfeiture of these properties as substitute assets rather than assets directly traceable to the offense as contemplated in United States v. Monsanto, 491 U.S. 600 (1989);

> (2) if filing the notices of lis pendens was improper, whether the filing of the lis pendens amounted to a violation of Defendant Balotin's Sixth Amendment right to counsel of his choice; and

> (3) the propriety of the Government's change in position to seek Balotin's properties as directly traceable assets on March 5, 2020, in light of its subsequent determination to pursue the properties as substitute assets prior to the close of trial, and the effect of that change on the Court's consideration of Mr. Balotin's contention that his Sixth Amendment right to counsel was violated warranting a new trial.

Id. at 2-3.  In compliance with the Court's Order, the Government filed its supplemental response to Balotin's Motion on June 30, 2022, see The United

---

[2]    The parties jointly submitted a proposed briefing schedule, see Proposed Dates for Supplemental Briefing and Oral Argument (Doc. 651), and after taking the parties' proposed schedule into consideration, the Court entered an Order (Doc. 655) setting the deadlines for filing supplemental briefing and a date for oral argument.

States' Supplemental Response to Balotin's Motion for New Trial (Doc. 663; Government's First Supplemental Brief), and Balotin filed his brief on August 4, 2022, see Defendant Scott Balotin's Supplemental Brief in Support of Motion for New Trial (Doc. 672; Balotin's First Supplemental Brief).

In the Government's First Supplemental Brief, the Government contends that it was proper to file the notices of lis pendens on Balotin's properties while it sought forfeiture of those properties as substitute assets. Government's First Supplemental Brief at 13-14.  The Government asserts that in accordance with Florida law, the law under which it purports to have the authority to file the notices of lis pendens, there was a fair nexus between the properties and Balotin's criminal case such that these filings were proper. Id. at 14.  According to the Government, because it intended to seek the forfeiture of those properties if Balotin was convicted, it properly notified the public and prospective buyers via the notices of lis pendens that the Government claimed an interest in the properties.  Id.  To the extent Balotin argues that he needed the notices of lis pendens lifted so he could pay his legal fees, the Government notes that while the notices of lis pendens might have made it harder for Balotin to sell the properties, under the Eleventh Circuit's holding in United States v. Register, the lis pendens were not a restraint.  Id. at 14-15 (citing 182 F.3d 820, 835-36 (11th Cir. 1999)).  Thus, the Government contends Balotin was not entitled to a probable cause hearing or to have the

lis pendens lifted regardless of his need to use the properties to pay an attorney.  Id. at 15.  The Government asserts that this remains true even in light of the Supreme Court's decision in Luis.  Id. at 15-16.

Even if the notices of lis pendens were improper restraints on Balotin's assets, the Government maintains that their filing did not result in a violation of Balotin's Sixth Amendment right to counsel of his choice.  Id. at 17.  The Government first points out that Balotin retained Daniel Rashbaum – the same attorney Balotin hired pre-indictment, and the attorney Balotin stated he needed use of the funds from the properties to hire leading up to trial – to represent him at trial.  Id.  The Government maintains that Balotin's "self-serving, post-conviction assertion that he had wanted to hire a different attorney is insufficient to show that he was denied counsel of his choice."  Id. at 18-19.  Further, according to the Government, Luis instructs that a defendant has a Sixth Amendment right to use innocent property to pay counsel a reasonable fee, and here, the Government contends that Jose Baez's requested fee of $650,000 was unreasonable.  Id. at 19-20.  In addition, the Government asserts that the record does not support Balotin's contention that the notices of lis pendens prevented him from hiring Baez where Balotin never filed a motion to challenge them despite the Court's repeated instructions to do so, and he never fully answered the Court's questions regarding his sources of income.  Id. at 20-21.  The Government asserts that Balotin's conclusory

assertion that he lacked assets to hire Baez is insufficient and that he was required to fully disclose "his assets, liabilities, sources of income, net worth and to disclose whether he had access to financial accounts and the expected cost of his defense team." Id. at 21-22.  According to the Government, the record suggests that Balotin had other assets to pay for an attorney because he was able to pay a tax lien on his house, admitted to the existence of four family trusts (without stating their value or explaining why he could not use them), and did not have a notice of lis pendens filed on one of the properties when he first raised the issue.  Id. at 22.  Additionally, the Government contends that Balotin has neither shown that if he sold the properties at issue, their value was sufficient to cover Baez's fee, nor that he had access to the family properties subject to the lis pendens such that he could have used them to fund his defense.  Id. at 23-24.

Finally, the Government contends that it properly changed its theory of forfeiture leading up to and during trial.  Id. at 26.  The Government notes that Balotin has not asserted that the Government lacked a basis to classify the property as directly traceable to the crimes charged in the Indictment.  Id. According to the Government, because notices of lis pendens are not restraints under the Fifth Amendment, it was only required to have a good faith basis for finding "fair nexuses" between the properties and the criminal proceeding.  Id. Even assuming the notices of lis pendens were restraints, the Government

- 7 -

maintains that it only needed to have probable cause to believe that the properties were directly traceable, which Balotin does not contest. Id. at 26. Instead, Balotin argues that the Government failed to make a showing of probable cause, which the Government insists it was not required to do. Id. at 27. Moreover, the Government asserts that upon Rashbaum's request, the Government explained its theory of forfeiture as to the properties Balotin sought to sell. Id. And even if it was not permitted to change its theory of forfeiture, the Government maintains that Balotin was able to retain counsel of his choice, never filed a motion seeking to dissolve the lis pendens, and failed to fully disclose his assets to make a proper showing that he needed to sell the properties. Id. at 28. In sum, the Government contends that Balotin's argument "ignores Register and overstates Luis" because it assumes the notices of lis pendens are restraints and that Balotin would be entitled to their release based on his self-serving representations. Id. at 27-28.

In Balotin's First Supplemental Brief, he argues that the original filing of the notices of lis pendens was improper under Luis which instructs that "the government is constitutionally prohibited from [the] pretrial restraint of untainted assets where those assets are needed to hire counsel of choice." Balotin's First Supplement Brief at 29. Balotin asserts that the Government's actions fall squarely within that prohibition,

> particularly in light of the government's overt admissions <u>in court</u> <u>and on the record</u> that the purpose of its original recording of the <u>lis</u> <u>pendens</u> against the Balotin Properties was to prevent the properties from being sold and the proceeds being used to fund Mr. Balotin's defense.

<u>Id.</u> (emphasis in original).  With regard to the Government's reliance on <u>Register</u>, Balotin contends that the Eleventh Circuit in <u>Register</u> did not address whether the filing of a notice of lis pendens is a "restraint" under the <u>Sixth Amendment</u> and that at least one other court has recognized that "even if a '<u>lis pendens</u> is not a seizure because of the other incidents of property ownership that remain unaffected, it remains a partial restraint on the alienability of property, which affects the defendant's ability to retain counsel.'" <u>Id.</u> at 30 (citing <u>United States v. Fisch</u>, 2013 WL 5774876, at *3, *4 (S.D. Tex. Oct. 24, 2013)) (emphasis in original).  Balotin also argues that courts have recognized the significance of the effect of filing notices of lis pendens in other contexts such as determining the need for court appointed counsel or in declining to accept property subject to a notice of lis pendens as security for bail because "the defendant will have no incentive to appear where he is likely to ultimately lose the pledged property to forfeiture." <u>Id.</u> at 30-31.

Balotin also contends that by filing the Amended Bill of Particulars (Doc. 179) in early March of 2020, which changed the classification of his properties from substitute assets to assets directly traceable to the offense, the Government "radically alter[ed] the substantive and procedural setting for a

challenge to the restraint." Id. at 32-33.  Balotin asserts that the Government

did so improperly, in a "unilateral and unreviewable act[.]"  Id. at 34.

According to Balotin,

> [t]he problem here, of course, is that the government never asked
> for, much less obtained, a probable cause finding that any of the
> Balotin Properties would ultimately be proved forfeitable. Neither
> Monsanto nor Kaley[3] stands for the proposition that the restraint
> of untainted assets, or assets as to which the government has not
> obtained a probable cause finding, is constitutionally valid.

Id. at 35 (emphasis in original).  Balotin argues that the question is not

whether Luis "abrogated" Register, but whether considering Luis, and under

the specific facts here, the Government's filing of the notices of lis pendens was

unconstitutional.  Id. at 35-36.  Balotin further argues that the Court should

consider the Government's intent in filing the notices of lis pendens which

Balotin asserts was to prevent the properties from being sold as evidenced by

Assistant United States Attorney Julie Hackenberry's statements to the Court,

and the Government's refusal to compromise on any of the properties at issue.

Id. at 40.  In doing so, Balotin relies heavily on Chief Justice Roberts' dissent

in Kaley, for propositions such as, "the possibility that a prosecutor could elect

to hamstring his target by preventing him from paying his counsel of choice

raises substantial concerns about the entire proceeding."  Id. (quoting Kaley,

571 U.S. at 345).

---

3         Kaley v. United States, 571 U.S. 320 (2014).

The parties presented oral argument at a hearing held on August 29, 2022.  <u>See</u> Minute Entry (Doc. 675).  At the close of the hearing, the Court again directed the parties to file additional briefing on an issue raised during oral argument.  <u>Id.</u>  Specifically, the Court asked the parties to file supplemental briefing addressing the following issues:

> (1) whether the lis pendens were properly filed under Florida law; and
>
> (2) the effect, if any, that has on the arguments presented.

<u>See id.</u>  Both parties submitted the requested briefing on September 9, 2022. <u>See</u> Defendant Scott Balotin's Supplemental Brief on the Propriety of the Government Restraint of Substitute Assets Under State Law (Doc. 678; Balotin's Second Supplemental Brief); <u>see</u> The United States' Second Supplemental Response to Balotin's Motion for a New Trial (Doc. 679; Government's Second Supplemental Brief).  In Balotin's Second Supplemental Brief, Balotin asserts that the lis pendens were improper under Florida law. <u>See generally</u> Balotin's Second Supplemental Brief.  Next, Balotin cites to <u>United States v. Jarvis</u>, 499 F.3d 1196, 1203 (10th Cir. 2007) in support of his argument that state law governing the filing of notices of lis pendens is not meant to apply to criminal forfeiture of substitute assets.  <u>Id.</u> at 9-10.  He also contends that notices of lis pendens that do not serve their purpose are invalid which is the case here because Balotin only had a partial interest in one of the

eight properties at issue.  Id. at 10-11.  And, as to the effect the validity of the lis pendens has on his Sixth Amendment argument, Balotin contends "[t]he government's cynical misuse of state legal processes in the manner employed here serves only to compound the Constitutional violation already briefed."  Id. at 13-14.

In the Government's Second Supplemental Brief, it concedes that there is "no controlling precedent on this issue," but argues that the Court should find that Florida law permits the filing of notices of lis pendens on substitute assets.  Government's Second Supplemental Brief at 2.  The Government asserts that a notice of lis pendens can be filed under Florida law when there is a "nexus between the legal or equitable title to the property and [the plaintiff's] claims below."  Id. at 2-3 (quoting Space Dev., Inc. v. Fla. One Const., Inc., 657 So. 2d 24, 24 (Fla. 4th DCA 1995)).  According to the Government, the criminal proceeding could raise an interest in the property in favor of the Government sufficient to satisfy Florida's nexus requirement for filing a notice of lis pendens.  Id. at 4.  In addition, the Government argues that alienation of the property would disserve one of the purposes of criminal prosecution, to "secure just punishment," and the lis pendens put third party purchasers on notice of the threat to the property.  Id. at 4-5.  The Government acknowledges that the Tenth Circuit Court of Appeals in Jarvis, and several district courts, "have found that the filing of a notice of lis pendens is not

authorized under state laws similar to Florida's," id. at 6, but contends that those courts treated the forfeiture of substitute assets like collecting on a money judgment, which, the Government contends, it is not, see id. at 6-7.

The Government also asserts that even if the notices of lis pendens were improper under Florida law, for reasons set forth in its First Supplemental Brief, Balotin has not met his burden of showing he is entitled to a new trial. Id. at 7.  According to the Government, Balotin has not made an adequate showing that he lacked other assets sufficient to retain his chosen attorney and his reliance on his financial affidavit, the Magistrate Judge's decision to appoint counsel to represent him, and his post-trial, self-serving affidavit, are insufficient.  Id. at 7-12.  The briefing on Balotin's Sixth Amendment argument is complete and the Court now resolves the merits of the dispute.

## B. Analysis

The fundamental character of "a criminal defendant's Sixth Amendment right to the 'Assistance of Counsel'" is beyond doubt. Luis, 578 U.S. at 10.  And that fundamental right "guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire."  Id. at 12 (internal citations and quotations omitted).  Importantly, the Sixth Amendment does not just guarantee a defendant the right to competent counsel, the right to counsel of choice commands that a defendant who can afford to hire counsel "be defended by the counsel he believes to be best."

- 13 -

United States v. Gonzalez-Lopez, 548 U.S. 140, 146 (2006).  For this reason, the Supreme Court has observed that "the necessarily close working relationship between lawyer and client, the need for confidence, and the critical importance of trust" demands that a defendant have "'a fair opportunity to secure counsel of his own choice.'"  Luis, 578 U.S. at 11.  Accordingly, the violation of a defendant's Sixth Amendment right to counsel of choice is structural error and "not subject to harmless-error analysis."  Gonzalez-Lopez, 548 U.S. at 152.  The "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received."  Id. at 148.  Significantly, in Luis, the Supreme Court determined that "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment."  Id. at 10; see also United States v. Marshall, 754 F. App'x 157, 161 (4th Cir. 2018) (emphasis added) ("Luis does not apply if the defendant did not need the funds to retain counsel.").[4]

The parties have thoroughly briefed, and the Court has carefully considered, the issue of whether the initial filing of the notices of lis pendens

---

[4]    In this Order, the Court cites to decisions from other circuits and from district courts only to the extent that the Court finds the reasoning of the decisions to be persuasive, the factual circumstances to be analogous, and the law applied there to comport with that governing this case.  The Court recognizes that these cases have no precedential weight, but given the relatively small number of cases addressing the important issue raised here, the Court finds discussion of this non-binding authority to be helpful to the analysis.

was improper and whether the lis pendens amounted to a pretrial "restraint" of Balotin's assets such that their filing could violate his Sixth Amendment right to counsel of his choice.  The Government is correct that Eleventh Circuit precedent instructs that the "filing of a lis pendens pursuant to state statute does not constitute a 'seizure' and does not affect property interests to an extent significant enough to implicate the Due Process Clause of the <u>Fifth Amendment</u>."  <u>Register</u>, 182 F.3d at 837 (emphasis added).  However, the Eleventh Circuit's decision in <u>Register</u> does not address the critical questions before the Court here.  First, <u>Register</u> does not address the effect of a lis pendens on a defendant's untainted property or whether its effect is significant enough that it amounts to a restraint for purposes of the <u>Sixth Amendment right to hire counsel of one's choice</u>.[5]  Nor does it address the question of whether <u>any</u> limitation on the use of a defendant's property that results from a lis pendens <u>not authorized by state law</u> would be sufficient to violate the defendant's Fifth or Sixth Amendment rights.  Here, the Court has expressed, and continues to have, significant concerns regarding whether the lis pendens

---

[5]      In <u>Register</u>, the defendant argued that the pretrial restraint of his assets violated both his Sixth Amendment right to counsel of his choice and his Fifth Amendment right to due process.  182 F.3d at 834 – 837.  The court dispensed with the Sixth Amendment challenge in short order by noting that a defendant had no right to use assets subject to forfeiture because they were "not rightfully the defendant's."  <u>Id.</u> at 834.  Because a grand jury had made a determination that the assets at issue were subject to forfeiture pursuant to 21 U.S.C. § 853(c), <u>see id.</u> at 825, <u>Caplin & Drysdale, Chartered v. United States</u>, 491 U.S. 617 (1989) and <u>United States v. Bissell</u>, 866 F.2d 1343, 1351 (11th Cir. 1989) foreclosed his Sixth Amendment challenge.  Thus, <u>Register's</u> Sixth Amendment analysis did not consider the restraint of a defendant's own non-forfeitable or untainted assets which is the claim asserted here.

at issue in this case were properly filed under Florida law while the properties were classified as substitute assets.  However, upon review of the entirety of record, the briefing by the parties, and the applicable authority, the Court finds that Balotin has neither made a prima facie showing that the Government's filing of the notices of lis pendens prevented him from exercising his Sixth Amendment right to retain counsel of his choice nor has he raised the issue in a timely manner.[6]  As such, the Court need not resolve the issues left open by Register.

In the Motion, after having been convicted at trial of conspiracy to commit healthcare fraud and money laundering, Balotin contends for the first time that the Government's pretrial restraint on his family properties prevented him from retaining and being represented at the trial by counsel of his choice, specifically, criminal defense attorney Jose Baez.  Motion at 20-28. Never having mentioned Baez before filing the Motion, and likely because there is no evidence of any desire to retain Baez in the record, Balotin presents two declarations in support of his contention: the Declaration of Jose Baez, Motion, Exhibit 2 (Doc. 621-1; Baez Decl.) at 4-5 and the Declaration of Scott

---

[6]      Significantly, in Luis, both the defendant and the government stipulated that the restrained assets were untainted and that their restraint would prevent the defendant from using her funds to hire counsel of her choice.  578 U.S. at 9.

Balotin, Motion, Exhibit 3 (Doc. 621-1; Balotin Decl.) at 13-14.   In his

declaration, Baez states:

> 1.  I am a criminal defense attorney licensed to practice in Florida.
> 2.  After he was indicted in the above-captioned case, Defendant Scott Balotin asked me to be his lead trial counsel.
> 3.  As reflected in the draft fee contract attached as Exhibit 1, I provided Mr. Balotin with a flat fee quote of $650,000 for the trial of the above-captioned case.
> 4.  My understanding was that the only way Mr. Balotin could pay my fee was to receive proceeds from selling or borrowing against one or more of the real properties identified in the Bill of Particulars filed by the Government in this case, only one of which (Mr. Balotin's primary residence) was owned or controlled by him.
> 5.  I ultimately declined to act as lead trial counsel for Mr. Balotin when I learned that Mr. Balotin would be unable to pay my fee. This was because the real properties identified in the Bill of Particulars had been restrained by the lis pendens recorded against those properties by the Government, preventing their sale or encumbrance.

Baez Decl. at 4-5.  Baez attaches a "Retainer Agreement" which identifies Scott

Balotin as the client and "Case No.: 3:19-cr-191-J-34JBT" as the subject of the

representation.  See Baez Decl., Exhibit 1 (Doc. 621-1; Retainer Agreement) at

6-11.   The Retainer Agreement is undated and unsigned, id., and Baez's

declaration provides no time frame for his interaction with Balotin, see Baez

Decl. at 4-5.  The totality of the information presented in Balotin's declaration

is:

> 1. I am a defendant in the above-captioned case.
> 2. Dan Rashbaum was not my preferred choice to be my lead trial counsel.

3. My counsel of choice to represent me in the trial of the above-captioned case was Jose Baez.

4. As reflected in the draft fee contract attached as Exhibit 1, Jose Baez provided me with a flat fee quote of $650,000 for the trial of the above-captioned case.

5. The only way Jose Baez could be hired was by using proceeds from the sale of one or more of the real properties identified in the Bill of Particulars filed by the Government in this case.

6. Jose Baez ultimately decided not to be my lead trial counsel after he was unable to be paid from the sale of one or more of the real properties identified in the Bill of Particulars filed by the Government in this case due to the lis pendens placed on those properties by the Government.

7. After realizing that I was not able to hire my counsel of choice (Jose Baez), I hired Daniel Rashbaum to be my lead trial counsel using funds borrowed from a relative.

Balotin Decl. at 13-14. Both declarations are conclusory. Neither provides any specific facts or time frame. And other than the undated, unsigned Retainer Agreement, neither provides any evidentiary or corroborative support.

Assuming, without deciding, that filing the notices of lis pendens amounted to an improper pretrial restraint of Balotin's untainted assets,[7] the objective record before the Court simply does not support Balotin's belated contention that any such restraint interfered with his right to be represented

---

[7]     The Government contends that it had probable cause to assert that the assets were directly traceable to the offenses charged, and Balotin does not dispute that the properties were purchased during the timeframe of the charged conspiracy. The Supreme Court's decision in <u>Luis</u> in part, relied on the undisputed untainted "nature of the assets," and where that issue is unresolved, it likely impacts the Court's analysis. Because the Court assumes, without deciding, that the assets were improperly restrained, the Court need not weigh this here. However, it is nevertheless worth noting that Balotin has never raised a factual or legal challenge to the Government's theory for classifying the assets as directly traceable to the crime. Instead, he asserts the Government never <u>made a showing</u> that it had probable cause to believe the assets were directly traceable to the Court, the jury, or the grand jury.

- 18 -

by counsel of his choice.  This is so because nothing in the record suggests that Baez was Balotin's counsel of choice following the return of the Indictment or at any time before the jury returned the unfavorable verdict.  Nor is there sufficient information in the record to support Balotin's claim that the lis pendens prevented Balotin from retaining Baez or that he could have done so if the Government had agreed to release the restrained assets.  And, Balotin's untimely assertion of this claim does not warrant a new trial.  Thus, to the extent Balotin seeks a new trial based upon the purported violation of his Sixth Amendment right to counsel of his choice, the Motion is due to be denied.

With regard to Balotin's contention that Baez was his true counsel of choice, the record shows that Balotin retained Daniel Rashbaum and his law firm pre-indictment and wanted Rashbaum's firm to continue to represent him throughout the case.  Ultimately, Balotin did retain Rashbaum's firm and the firm represented him through the conclusion of the trial.  Because the record establishes that Rashbaum was Balotin's counsel of choice, he has failed to make a prima facie showing that the Government's filing of the notices of lis pendens interfered with his Sixth Amendment right to counsel of his choice. The Court reviews Balotin's statements, actions, and inactions supporting this conclusion below.

After a years-long investigation, on October 30, 2019, a grand jury sitting in the Middle District of Florida returned the Indictment charging Balotin and

his co-defendants with committing various federal offenses.  See Indictment. Law enforcement arrested Balotin on November 14, 2019, and he made his initial appearance before Magistrate Judge Toomey that same day.  See Clerk's Minutes (Doc. 35; Nov. 14, 2019 Minutes).  At his initial appearance, Balotin was accompanied by a local criminal defense attorney, Brian DeMaggio, who stated that his firm had not yet been retained, but he would appear for Balotin for purposes of that hearing.  November 14, 2019 Transcript (Doc. 658; Nov. 14, 2019 Tr.) at 7.  Judge Toomey scheduled a status of counsel hearing for November 18, 2019.  See Nov. 14, 2019 Minutes at 2.  DeMaggio did not appear for that hearing or at any other time.  Balotin appeared as scheduled on November 18th, without counsel.  November 18, 2019 Transcript (Doc. 570; Nov. 18, 2019 Tr.) at 3.  He advised that he needed additional time to obtain counsel, that he had paid attorneys a lot of money and they weren't showing up, id. at 5, and that he was talking to a few different lawyers, id. at 4-5. Balotin did not mention anything about the lis pendens or not having funds to hire counsel, he simply stated that he was "hoping to make a decision [about counsel] shortly."  Id. at 4.  Although he did not identify the attorneys that "weren't showing up" at the time, the Court later learned this to be a reference to Rashbaum and his firm.

Balotin next appeared before Judge Toomey on November 22, 2019. November 22, 2019 Transcript (Doc. 571; Nov. 22, 2019 Tr.).  At this hearing,

he complained that the lis pendens filed on properties that were not involved in the charged offenses were "improper" and that he needed access to the properties "for [his] defense counsel." Id. at 7. Balotin explained that he "had a very well-renowned attorney in Virginia, David Smith," who was a forfeiture expert and who opined that the unilaterally filed lis pendens were improper. Id. at 8-9. In response, Judge Toomey advised Balotin, "[i]f you have an attorney that is a forfeiture expert and he feels confident that he's right, then I would think you could get a lawyer to represent you and get the forfeiture lifted, but the Court is not going to decide forfeiture issues at this point in the case." Id. at 9. Returning to the question of the status of Balotin's legal representation, Balotin explained that he had hired Rashbaum's firm in 2017, prior to the return of the Indictment, when he paid the firm $330,000 to meet with AUSA Julie Hackenberry. Id. at 17. According to Balotin, Rashbaum's firm would not let Balotin meet with AUSA Hackenberry until he paid them an additional $170,000, which he did not have. Id. at 12. Balotin explained that now, he still could not get Rashbaum's firm to show up to his arraignment without the additional $170,000. Id. Noting that Balotin had taken inconsistent positions on his need for counsel and in light of Balotin's request that he be provided with the Government's disclosure of discovery before he decided if he wanted court appointed counsel, the Court made the observation that Balotin was "kind of trying to maneuver and manipulate and play games"

with regard to obtaining counsel.  Id. at 11-13.  Balotin was unequivocal in his response.  He stated, "I wanted to hire these attorneys down south," referring to Rashbaum and his firm.  Id. at 13.  He made no mention of Baez or of a desire to hire any attorney other than Rashbaum and his firm.

On December 3, 2019, Balotin again appeared before the Magistrate Judge without counsel.  See Clerk's Minutes (Doc. 120).  Balotin advised that since the last hearing he had met with many attorneys and found one who agreed to a good negotiated rate, but had since learned the attorney had a conflict.  December 3, 2019 Transcript (Doc. 572; Dec. 3, 2019 Tr.) at 2-3.  He also advised that he had a meeting with another attorney that afternoon but did not identify that attorney.  Id. at 3.  Two days later, he appeared at a status of counsel hearing stating that he had exhausted his search for counsel and requested a court appointed attorney.  December 5, 2019 Transcript (Doc. 648; Dec. 5, 2019 Tr.) at 3.  However, the Court was unable to determine if Balotin qualified for court appointed counsel because Balotin insisted that he could not answer questions about "joint income" without speaking to an attorney.  Id. at 7-9.  Balotin did not mention Baez or a desire to hire him at either the December 3rd or December 5th hearing.  And his only mention of the lis pendens on December 5th was in his explanation of why he was confused about whether income from the rental properties was "joint income."  Id. at 7.

Balotin's next status of counsel hearing was held on December 10, 2019. See Clerk's Minutes (Doc. 133).   Judge Toomey once again inquired as to Balotin's efforts to find an attorney.  See December 10, 2019 Transcript (Doc. 164; Dec. 10, 2019 Tr.) at 4.  Balotin responded that he had "spoken to the previous counsel that I - - that I already paid money to [referring to Rashbaum].  They still want the rest of their fee. I can't afford it. But the other attorneys here in town, given their enormous fees, I can't afford it."  Id.[8] He lamented that he could not afford any of the twelve attorneys he had spoken to because of the "money situation."  Id. at 4-5.  However, he never suggested that he had chosen an attorney that he wanted to represent him instead of Rashbaum or that he had found the one attorney he truly wanted, Baez, but could not afford to retain him.  In discussing the rates he was being quoted by the attorneys he had spoken to, Balotin gave a range of $150,000 to $800,000, but again did not suggest that the attorney he wanted to hire had quoted him $650,000.  Id. at 5-6.  After questioning Balotin regarding his finances, the Court determined "based upon the information provided" that Balotin was "financially unable to obtain counsel."  Id. at 24.  The following day, the Court appointed Richard Landes to represent Balotin.  See Order of Appointment (Doc. 135).

---

[8]     Balotin does not suggest that Baez is an attorney that would be referred to as an "in town" attorney.

On December 13, 2019, the Government filed a Bill of Particulars for forfeiture of property (Doc. 139) in which it added the property "located at 5839 Cedar Oaks Drive" as a property subject to forfeiture as a substitute asset. Prior to that date, the Government had not encumbered the Cedar Oaks Property in any way, and as such, it appears to have been available to assist Balotin in obtaining funds to hire counsel.

Landes represented Balotin for almost a month but never filed a motion to lift the lis pendens.  And Balotin has never suggested that he asked Landes to do so despite asserting on November 22, 2019, that a forfeiture expert told him the lis pendens were improper and he wanted them lifted so that he could hire an attorney, and despite having been told by the Magistrate Judge that he would have to file a motion to have them lifted.  See Nov. 22, 2019 Tr. at 7-9.  Notably, during the December 10th hearing, Balotin complained about the lis pendens but not because they interfered with his ability to obtain counsel.  See generally, Dec. 10, 2019 Tr.  Instead, he complained that the lis pendens prevented him from getting a loan to prevent a $35,000 tax fee sale of his residence.  See Dec. 10, 2019 Tr. at 5, 7, 18, 21-22.

On January 8, 2020, Landes filed a motion explaining that Balotin wanted new court appointed counsel and stating that the reasons would "best be discussed at a hearing."  See Defendant Scott Balotin's Motion That New Counsel Be Appointed to Represent Him (Doc. 149).  The following day, before

the Court held such a hearing, Curtis Fallgatter filed his notice of appearance as counsel retained to represent Scott Balotin. <u>See</u> Notice of Appearance (Doc. 151). But, only a few weeks later, on January 31, 2020, Fallgatter filed a motion to withdraw, <u>see</u> Motion to Withdraw (Doc. 168), which Judge Toomey granted on February 3, 2020. <u>See</u> Order (Doc. 169). At that time, Judge Toomey ordered Balotin to appear at a special status conference before the undersigned to address the status of his legal representation. <u>See</u> <u>id.</u>

The Court conducted part of the status conference <u>in</u> <u>camera</u> and <u>ex</u> <u>parte</u>. <u>See</u> February 6, 2020 <u>Ex</u> <u>Parte</u> In Camera Transcript (Doc. 574; Feb. 6, 2020 <u>Ex</u> <u>Parte</u> Tr.) at 2-7.[9] During the <u>ex</u> <u>parte</u> proceeding, Balotin explained the issues he encountered with Landes and Fallgatter. <u>Id.</u> According to Balotin, he, Landes, and Fallgatter disagreed about whether Balotin should undergo a psychological evaluation. <u>Id.</u> He did not suggest he had any other disagreement with Landes, such as a refusal by Landes to file a motion to lift the lis pendens. With respect to his recently retained attorney, Fallgatter, Balotin stated that he had borrowed $150,000 from a family member to retain Fallgatter. <u>Id.</u> at 3.

> And then four days later, after Mr. Fallgatter had this - - we had this agreement, he gave me a supplemental engagement letter asking for more money. <u>And I didn't want to sign.</u> I thought we

---

[9]    Both parties freely cite to the contents of various <u>in</u> <u>camera</u> and <u>ex</u> <u>parte</u> hearings held in this case. In light of Balotin's claims which require consideration of statements made during these proceedings, the Court concludes that it is necessary and proper to discuss and rely on matters that occurred during these hearings at this stage of the case.

had an agreement, you know, and we did have an agreement, a secured engagement letter, and for some reason he just decided he was going to change his engagement terms.

So he put me in a really precarious situation. I told him, I said, you know: We have an agreement, Mr. Fallgatter.

And he said: I'm not going to agree - - I'm not going to hold to that agreement. I'll give you - - he goes: I'll just disengage - - yes, it's a dealbreaker, and I'll disengage you as a client. And I will also just take a modest fee out of the fee that you gave me.

So he withdrew $18,000 for a fee for a week of work. And then now I'm stuck without - - and then he withdrew because I wouldn't sign.

Id. (emphasis added). Notably, while Balotin expressed frustration that Fallgatter was changing the terms of their agreement, he did not state that he could not afford the additional fee due to the lis pendens on his properties or that Fallgatter was, unwilling to, or had failed to, file a motion challenging the lis pendens so that he could obtain funds to pay the additional retainer or obtain a different lawyer. Balotin went on to advise the Court that Landes was willing to represent him again but that he, Balotin, was "interviewing some other attorneys with the remainder of the money that [he] borrowed from a family member to secure private counsel." Id. Yet again, Balotin said nothing that would suggest that he had found a specific lawyer he wanted to hire. And he did not mention Baez, did not express a desire to retain Baez, and did not say he needed to have the lis pendens lifted so that he could hire the specific attorney that he really wanted to represent him. What he did say was that he

- 26 -

was traveling to Miami the next day to meet with Rashbaum and his firm.  Id. at 5.

On February 18, 2020, Rashbaum emailed AUSA Hackenberry representing that Balotin intended to hire him to defend his case. Government's First Supplemental Brief, Ex. A (Doc. 663-1).  At a status of counsel hearing held later that day, Balotin similarly informed the Court that he was attempting to retain Rashbaum as counsel.  See Minutes (Doc. 174). Specifically, Balotin stated,

> Your Honor, I've had eight -- excuse me, five separate meetings over the past week and a half, and three separate telephone conferences with attorneys.  I believe I've secured counsel with the attorneys I had preindictment, and we just need to work out a few details.  And I believe he e-mailed -- Dan Rashbaum e-mailed Mrs. Hackenberry this morning.

February 18, 2020 Status of Counsel Transcript (Doc. 653; Feb. 18, 2020 Tr.) at 2.

Recognizing that Balotin had previously made concerning statements about his "preindictment counsel and his relationship with them," the Court excused AUSA Hackenberry and held a portion of the hearing ex parte.  Id. at 4.  The Court confirmed that Balotin was trying to retain Rashbaum and his firm, the same lawyers he had retained and who had represented him pre-indictment.  See Feb. 18, 2020 Status of Counsel Transcript (Proceedings held ex parte under seal) (Doc. 662; Feb. 18, 2020 Ex Parte Tr.) at 2.  Balotin stated

that he was currently trying to come up with the rest of the fee owed to those attorneys, $163,000, and that he had spoken with an asset forfeiture expert, Evelyn Sheehan of Kobre & Kim, who helped him identify substitute assets he could use to fund his defense. Id. at 3-4. Specifically citing the Supreme Court's decision in Luis, Balotin stated that the majority, if not all of the restrained properties, were substitute assets, and under Luis, he could use those assets for his defense. Id. After initially saying that he planned to retain Sheehan's firm "this week or whenever I -- as soon as possible," Balotin stated that Rashbaum was going to try to obtain a release of the lis pendens first and if he failed, Balotin would have to engage the forfeiture firm to obtain their release. Id. at 4.

> THE COURT:  So you're engaging [the forfeiture] firm?
> THE DEFENDANT:  If -- Mrs. Hackenberry, if it's going to have to be litigated, I'm going to have to probably retain that firm.
> Dan is going to do -- Dan Rashbaum is going to do his best to just release them.  That's why he made a phone call to her.  And if she will release them, because they are substitute assets and I'm allowed to use those for my defense, my choice of counsel, but if she -- if it becomes an issue with her and the department, then it's going to have to be litigated.

Feb. 18, 2020 Ex Parte Tr. at 4.  Nothing in any of Balotin's statements at this hearing suggested that he wanted to retain any attorney to represent him at trial other than Rashbaum and his firm.

When the Court inquired about the full amount of Rashbaum's retainer, $500,000, Balotin said he had been quoted higher retainer figures, but did not

mention Baez or his requested $650,000 fee. Id. at 4-5. Instead, he complained that a Jacksonville lawyer, David Barksdale, had quoted him $500,000 and opined that because Barry Cohen, the Tampa lawyer who passed away after Balotin retained him had charged $500,000, others were charging the same amount. Id. The Court sought to clarify that all that had changed between Balotin's initial complaints about Rashbaum and his current situation was that Balotin now thought he could obtain the assets to pay Rashbaum's fee. Id. at 5. Balotin confirmed that to be accurate. Id.

Despite having the opportunity to speak outside the presence of the Government specifically on the issue of whether he really wanted to retain Rashbaum, Balotin did not express any reservations or suggest he wanted Baez or any other attorney to represent him at trial. And he certainly gave no indication that he was only hiring Rashbaum because the lis pendens prevented him from hiring Baez. To the contrary, his statements reflect that seeking a release of the lis pendens was contemplated as part of hiring Rashbaum. Later, when the Government returned, Balotin confirmed that, despite what Rashbaum had already been paid, he would not "represent [Balotin] unless [he] obtain[ed] the release of the additional funds[.]" Feb. 18, 2020 Tr. at 8. Thus, Balotin's concerns regarding the lis pendens at this February 18th hearing related to obtaining funds sufficient to pay Rashbaum, not Baez or anyone else. Expressing concern about the delay resulting from

Balotin's failure to secure counsel, the Court set another status conference for March 2nd and specifically cautioned Balotin that by that date he would either have to have resolved the issue with Rashbaum or be pursuing a resolution of the lis pendens dispute against the Government.  Id. at 8-9.

Following the February 18th hearing, Rashbaum communicated with AUSA Hackenberry regarding the release of Balotin's assets and Hackenberry explained the Government's theory that the assets Rashbaum identified were tainted and that it would not remove the lis pendens.  Government's First Supplemental Brief, Ex. B.  Specifically, in a February 24, 2020 email to Hackenberry, Rashbaum explained

> Sure. I am happy to discuss when we talk. I understand that those assets are clean assets and are being properly [sic] frozen as "substitute assets." Under the Supreme Court's recent decision in Kayley [sic] such assets can be freed up for defense costs.
> We can discuss further when we speak but that is the overall theory.
>  .  .  .

Id. at 2.  On February 27, 2020, Hackenberry emailed Rashbaum to explain the Government's legal theory for why the assets he identified were "tainted."  See Government's First Supplemental Brief, Ex. C.  In the email, she stated, in relevant part:

> I understood your position to be that the Cathedral Place house was purchased by Balotin prior to the fraudulent activity, that Balotin then sold that house to Jones, and Balotin took Jones' money, which you believe was clean money, and used it to purchase other properties, including Ernest Street and Myra, which would only be

substitute assets and which Balotin wants to sell to pay for an attorney.

However, in looking at the timing of the sale of the house, Jones and Balotin both were engaged in the healthcare fraud scheme at that time.

With regard to the properties and the funds used to purchase the properties –

On or about June 19, 2015, BALOTIN went to the SunTrust National Bank, San Jose Branch, and conducted a $540,000 deposit into SunTrust Bank account number 1000181165084, titled EB IPUG Trust (hereinafter "SunTrust Account 5084"). The transaction was captured on surveillance footage wherein BALOTIN is conducting the deposit, even though he is not a signor on the account. The deposit consisted of 3 checks:

1) Official Check Number 003123209 in the amount of $200,000.00 (from JONES, containing more than $10,000 in healthcare fraud proceeds);

2) Cashier's Check Number 6607300789 made payable to Scott Balotin in the amount of $40,000.00 (from JONES, containing more than $10,000 in healthcare fraud proceeds);

3) A $300,000 check drawn on Chase Bank Account number 446238292, titled, "EB IPUG Trust Dated February 13, 2015, Ellen M. Balotin."

It is the government's position that the monetary transactions between BALOTIN and JONES are money laundering violations, in violation of 18 USC 1957 and 18 USC 1956h. As BALOTIN was the head of the of the [sic] organization involved in the healthcare fraud scheme, he had direct knowledge the funds JONES was using to purchase the property were from the healthcare fraud scheme since JONES reported to BALOTIN. Additionally, BALOTIN was aware that since sometime in 2014, JONES' primary source of income was from the healthcare fraud scheme. At the point in time the $540,000 deposit was conducted, we had executed search warrants at JONES' residence (Cathedral Oaks) and the Case Park storefront.

Furthermore, SunTrust Account 5084 was opened the same day of the deposit. The sole signor on the account was Ellen BALOTIN. It appears the account was opened with the purpose of concealing the true source of the funds, i.e., the healthcare fraud conspiracy. The third check (the $300,000 check) came from yet another trust account in Ellen BALTON's name. For at least a year prior to the deposit on June 19, 2015, BALOTIN was paid over $2,000,000 from

- 31 -

the healthcare fraud scheme, and it was likely these funds were also from the scheme. The funds were all commingled after the deposit on June 19, 2015, further concealing the true source of the funds. The $540,000 deposit into SunTrust Account 5084 funded a $390,000 wire on June 24, 2015. Per records obtained from the real estate closing attorney, Duane Romanello, the wire funded the purchase of:

      1) 4027 Forest Blvd.
      2) 2678 Ernest St.
      3) 2984 Myra Street

Since this wire contained over $10,000 in healthcare fraud proceeds, it was conducted in violation of 18 U.S.C. § 1957(a). The purchase of these three properties involved a monetary transaction knowingly conducted with more than $10,000 in criminally derived funds and, as such, the purchase of these three properties are subject to civil forfeiture, in its entirety, pursuant to 18 U.S.C. § 981(a)(1)(A) and criminal forfeiture pursuant to 18 U.S.C. § 982(a)(1).

Id. at 2-4.   In response, Rashbaum simply said he would forward the information to Balotin.  Id. at 2.[10]

Balotin appeared for another hearing before the undersigned on March 2, 2020.  See Clerk's Minutes (Doc. 177).  Balotin again stated that "our previous attorney is trying to be hired[,]" a reference to Rashbaum and his efforts to convince Hackenberry to release the lis pendens.  Status of Counsel Transcript March 2, 2020 (Doc. 575; March 2, 2020 Tr.) at 2.  Balotin explained that "[t]his past Thursday[,]" AUSA Hackenberry expressed that she thinks the assets are from tainted funds as opposed to untainted.   Id.   Balotin disagreed and

---

[10]     As previously noted, Balotin has never articulated a factual or legal challenge to the accuracy of the theory of forfeitability set forth in AUSA Hackenberry's email.

expressed the view that the properties were substitute assets that he could use for his defense.  Id. at 3.  When the Court asked Balotin where he was on getting an attorney, he responded "[w]ell, we needed the Government to release those assets that the law doesn't allow for them to restrain."  Id.  The Court responded,

> Well Mr. Balotin, perhaps that's something you want to litigate. But if you're expecting me to just look at Ms. Hackenberry and say release the funds, as we sit here today, that's - - I don't have any basis to do that.

Id.  Balotin asked if they could "both make [their] arguments" on the matter, and the Court explained,

> Well, you would need to file a motion and need to give me authority and you'd need to be identifying specific things.
>
> It's not a matter of just walking in here and saying I think - - I think it's untainted funds and she thinks it's tainted.

Id.  AUSA Hackenberry similarly expressed the view that if Balotin wanted to obtain a release of the lis pendens, he would need to file a motion.  Id. at 4-5.

After explaining to Balotin that the Court did not have near enough information to decide the disputed issue as to the propriety of the lis pendens, the Court asked, "Mr. Balotin, are you - - is it your position that without the release of the funds that are being restrained that you are unable to afford counsel to represent you?"  Id. at 6-7.  When Balotin said yes, the Court referred the matter to Judge Toomey to determine whether the Court should appoint counsel to represent him.  Id. at 7.  The Court advised Balotin, "And in the

interim, Mr. Balotin, if you want either appointed counsel to file a motion seeking the release of your assets so that you can retain a lawyer, or if you want to litigate that yourself, or if you want - -. . . or if you - - if this law firm in South Florida that already has a significant sum of money from you, if they want to litigate that matter on your behalf, that's fine as well.  But at this point we need - - the case has got to move forward." Id. at 8.

At the next hearing on March 4, 2020, Balotin again discussed challenging the lis pendens but did not mention seeking their release to pay anyone other than Rashbaum.  See generally March 4, 2020 Status of Counsel Transcript (Doc. 649; March 4, 2020 Tr.).  In discussing his desire for the lis pendens to be lifted, Balotin specifically acknowledged having been told by the Court that he would have to file a motion to get that relief.  Id. at 3-4.  Later in the hearing, Balotin stated

> THE DEFENDANT: Well, I think the lis pendens should be removed. I think they were erroneously put on the properties. I've spoken to an attorney who's an expert in this. He's actually a Supreme Court attorney. He actually argued the Luis case. He actually thinks that I have a defensible position in that. And that would afford me to pay for these attorneys.
> . . .
> THE DEFENDANT: That's the position we're in right now. And we can file a motion. The government has a different view. We also have a different view. And he's an expert. He actually argued this in front of the Supreme Court, Luis vs. the United States, and won that motion.

Id. at 30 (emphasis added).  When asked why this newly mentioned forfeiture attorney didn't file a motion, Balotin said the attorney might be hesitant to make a "permanent appearance" in the case.  Id. at 31.  He also asserted that the attorney was willing to work with his Court appointed attorney and would not even charge a fee to file the motion.  Id.[11]  In response, Judge Toomey noted that the attorney "could certainly file a motion to make a limited appearance." Id.  Subsequently, after conducting an ex parte in camera discussion with Balotin and Landes, the Court appointed Landes to represent Balotin, see Order of Appointment of CJA Counsel (Doc. 183).

On the day the Court entered the Order of Appointment, March 5, 2020, the Government filed an Amended Bill of Particulars confirming its theory that

---

[11]      While Balotin did not identify this attorney by name during the hearing, the Motion makes clear that the attorney was Howard Srebnick.  See Motion at 22-23; Balotin's First Supplemental Brief at 7, n.2.  And the Luis decision confirms that Srebnick was counsel of record before the Supreme Court in that case.  Luis, 578 U.S. at 7.  According to the Motion, in a text exchange on March 4, 2020, Srebnick declined to represent Balotin because of the lis pendens.  Motion at 23-24.  The Court rejects this argument as it is supported by no evidence and contradicted by the record.  First, Balotin does not say anything about Srebnick in his declaration, and he provides no declaration from Srebnick attesting to the fact that he declined the representation for that reason or any reason.  And, the text message exchange to which Balotin cites does not say that.  Motion Ex. 1 (Doc. 621-1; Srebnick text) at 2.  In the March 4th text exchange, Balotin seeks input from Srebnick in advance of a hearing to be held later that day at 3:30.  Id.  Srebnick expresses his opinion that the Government is "putting lawyers on notice" but does not say he is declining to represent Balotin.  Id.  Instead, he advises Balotin to call him at 1:00 p.m.  Id.  Notably, Balotin appeared before Judge Toomey later that same day at 3:30 as anticipated, and it was at that very hearing that Balotin said Srebnick was not only willing to assist in litigating the lis pendens issue but that he was willing to do so without charging a fee.  So Balotin provides no evidence in support of his belatedly raised argument that Srebnick declined to represent him because of the lis pendens, and the only evidence he points to contradicts the assertion.  Thus, the contention in the Motion that Srebnick declined to represent Balotin because of the lis pendens is without merit.

Balotin's assets were traceable to the offense.  See generally Amended Bill of Particulars.  Landes did not challenge the Government's decision to do so nor did he address the lis pendens further, and despite Balotin's statements at the March 4th hearing, Srebnick, the Supreme Court forfeiture attorney, did not do so either.  About a month and a half later, on April 27, 2020, Rashbaum filed a Notice of Appearance as counsel for Balotin, see Notice of Attorney Appearance (Doc. 197), and the Court granted Landes' motion to withdraw, see Order (Doc. 201).  Neither Rashbaum nor Balotin ever mentioned any concern about the lis pendens again until after the verdict when Balotin filed the instant Motion seeking a new trial.  And, until this Motion, no motion challenging the propriety of the filing of the lis pendens or the Government's failure to show probable cause that the assets were truly directly traceable to the charged conduct was filed.

While Balotin now says Jose Baez was his counsel of choice, the record fails to support even the slightest inference that this was his desire at any time before he received the unfavorable verdict.  Balotin never mentioned Baez in any hearing.  The Court notes that Balotin was not shy in his discussions with the Court at hearings addressing the status of his efforts to obtain counsel.  He did not hesitate to speak, and he did not hesitate to identify lawyers he was considering or speaking to by name.  He readily named the asset forfeiture lawyers he had consulted and spoke of having hired Barry Cohen and having

tried to retain David Barksdale and their fees.  In his discussions with Judge Toomey, Balotin spoke of interviewing lawyers – but never once said he had found the lawyer he wanted but could not hire that lawyer because of the lis pendens.  He also never once mentioned the fee, $650,000, that he needed to pay Baez.  And he never suggested that he preferred not to retain Rashbaum.  To the contrary, he stated that he wanted to hire Rashbaum and his firm, the attorneys that had represented him pre-indictment, and confirmed that the only impediment to his hiring Rashbaum had been his financial ability to pay the retainer.  But, as Rashbaum ultimately appeared and represented Balotin, that impediment was resolved by Balotin using an undisclosed amount of money he borrowed from an undisclosed family member.

The only evidence Balotin now offers in support of his belated contention that Baez was his counsel of choice, is his own self-serving affidavit and that of Baez.  Balotin's after the fact affidavit merely states that Baez was his counsel of choice and

> [t]he only way Jose Baez could be hired was by using proceeds from the sale of one or more of the real properties identified in the Bill of Particulars filed by the Government in this case.

Balotin Decl. ¶ 3, 5.  According to Balotin, Baez declined to represent him because Balotin could not pay him with the proceeds of the sale of one or more of Balotin's assets due to the lis pendens.  Id. ¶ 6.  And Baez states that Balotin asked him to be his lead trial counsel, but he declined when he learned that

Balotin could not pay his fee.  Baez Decl. ¶ 2, 5.  Baez states "This was because the real properties identified in the Bill of Particulars had been restrained by the lis pendens recorded against those properties by the Government, preventing their sale or encumbrance."  Id. ¶ 5.  However, the record belies this post-conviction contention that the lis pendens prevented Balotin from retaining Baez.

Notably, neither Balotin nor Baez, in their declarations or in the attached Retainer Agreement, describe any timeline regarding Baez's potential representation of Balotin or discuss with any detail of how the lis pendens impacted their potential relationship, only that Balotin contacted Baez after he was indicted.  More importantly, the Retainer Agreement specifically recognized the need to get the lis pendens lifted to compensate Baez and provided a mechanism for doing so.  The Retainer Agreement stated that the Baez Law Firm would retain Matthew Troccoli "to enter a limited appearance in [Balotin's] forfeiture case simply for the purpose of attempting to assist [Balotin] in obtaining access to assets enough to retain FIRM."  Retainer Agreement at 1.  Further, the Retainer Agreement provided that Balotin would agree "to secure a retaining lien against any and all properties potentially released for purposes of the FIRM securing its attorney's fees."  Id.  The Retainer Agreement also stated

> d.   The FIRM will not undertake defense of the CLIENT and no Notice of Appearance will be filed with Court unless and until the FIRM receives either payment and/or <u>successfully secures a lien on the properties listed in the Forfeiture Complaint.</u>[12]  Upon the FIRM's entry of a Notice of Appearance, the fee paid or owed by CLIENT to the FIRM pursuant to this Agreement becomes non-refundable.

<u>Id.</u> (emphasis added).   These provisions contradict Balotin and Baez's declarations that the lis pendens prevented Balotin from hiring Baez.  The Retainer Agreement specifically contemplated retaining Troccoli to assist Balotin with obtaining access to restrained assets, Balotin agreeing that Baez would have a lien on those assets, and Baez making an appearance in the case once such lien was secured.  But Matthew Troccoli never appeared in Balotin's case, nor did any of the many asset forfeiture experts Balotin mentioned to the Court.  And in the declarations both Balotin and Baez fail to provide any explanation for the fact that neither he nor Baez signed the Retainer Agreement that addressed the manner for freeing up the assets necessary for Baez to appear and represent him.  Nor do they explain why Troccoli, the forfeiture lawyer, could not and did not appear in the case or file a motion to lift the lis pendens as contemplated so that Baez could obtain the lien he required to

---

12 None of Balotin's properties were listed in the Indictment.  Thus, the Retainer Agreement's reference to "the properties listed in the Forfeiture Complaint" appears to be a reference to the properties identified in the Bill of Particulars that were subject to the lis pendens.

assure his compensation.  In short, the declarations are vague, conclusory, inconsistent with the Retainer Agreement and completely inconsistent with the statements made by Balotin in Court every time he spoke about his efforts to obtain counsel.  The record supports only one conclusion, that Balotin was represented at trial by the lawyer he retained pre-indictment who was also the lawyer Balotin told the Court he wanted to hire, and that attorney, Dan Rashbaum, was his counsel of choice.[13]  The record simply fails to support Balotin's post-verdict contention that Baez was ever his counsel of choice.

Balotin's failure to file any motion challenging the lis pendens despite claiming he needed the assets to obtain counsel, repeatedly being told that he had to file a motion, and having access to lawyers able to do so, also supports the Court's conclusion that Balotin had his counsel of choice all along, and the presence of the lis pendens did not interfere with his Sixth Amendment right to counsel of his choice.  From the earliest days of the case, at the hearing on November 22, 2019, Balotin told Judge Toomey that he spoke to David Smith, a "well-renowned" forfeiture expert, who said the lis pendens were improper.  Nov.

---

[13]     In one conclusory sentence, Balotin contends that Rashbaum's reduced fee was insufficient to allow him to engage experts or investigators to assist with his defense.  Motion at 24.  However, he presents no evidence in support of this conclusory statement.  He does not say what experts he wanted to hire or what investigations could not be done.  Nor does he explain why Rashbaum could not have filed a motion seeking a court appointed expert or investigator as both Landes and Fallgatter had done during the time that each represented Balotin.  See In Camera Ex Parte Motion for the Appointment of an Expert in the Field of Forensic Accounting (Doc. 148); Defendant's Motion to Appoint Forensic Expert (Doc. 156).  This argument, lacking any evidentiary support, is wholly insufficient to warrant further discussion much less a new trial.

22, 2019 Tr. at 8-9.  In response, Judge Toomey informed Balotin, that he "could get a lawyer to represent [him] and get the forfeiture lifted."  Id. at 9.  Again, on February 18, 2020, Balotin told the Court that he spoke with yet another asset forfeiture expert, Evelyn Sheehan, who told Balotin he could use his substitute assets to fund his defense.  Feb. 18, 2020 Ex Parte Tr. at 3-4.  Balotin expressed that he was prepared to retain her firm to litigate the matter.  Id. at 4.  And the Court cautioned him that he needed to resolve the issue of his representation or be pursing a resolution of the lis pendens dispute with the Government before the next hearing scheduled for March 2nd.  Id. at 8-9.  On March 2, 2020, when the Court asked Balotin whether he had obtained an attorney, he responded that although the Government thought his assets were tainted, "we" still did not believe the assets were subject to forfeiture and the assets could be used to fund his defense.   March 2, 2020 Tr. at 2-3.  Two days later, on March 4, 2020, Balotin told Judge Toomey that the attorney who argued Luis told him that he would work with appointed counsel to file a motion challenging the lis pendens and that he was willing to do so without a fee.  March 4, 2020 Tr. at 30-31.  Yet no motion challenging the lis pendens was filed.

From December 11, 2019, to January 9, 2020, court appointed counsel represented Balotin and made no effort to have the lis pendens lifted.  And in January of 2020, Fallgatter was counsel of record for Balotin but did not move to lift the lis pendens.  Notably, when Balotin explained his disagreements with

these lawyers to the Court on February 6th, he didn't mention anything about wanting them to file the motion he knew needed to be filed if he wanted the lis pendens lifted. Similarly, during the Court's in camera session with Balotin and Landes on March 4, 2020, the Court addressed their previous disagreements about filing motions. March 4, 2020 Excerpt of Proceedings (Sealed In Camera Portion of Digitally Recorded Status of Counsel) (Doc. 669; March 4, 2020 Sealed Tr.). Neither Balotin nor Landes brought up any issues related to Landes' refusal or failure to challenge the lis pendens. See generally id. Indeed, Landes confirmed with the Court that another attorney could still seek to appear on behalf of Balotin to litigate the propriety of the lis pendens despite his appointment. Id. at 11. Yet none appeared for that purpose.

Additionally, Balotin offers no explanation for why the $132,000 remaining from the funds he borrowed to retain Curtis Fallgatter in January of 2020, were not used to retain one of the forfeiture experts he identified for the limited purpose of attempting to release the lis pendens or why the value of the Cedar Oaks Property, while unrestrained, could not have been used to obtain counsel at least to challenge the lis pendens. In fact, Balotin provides no explanation at all for not filing a motion to lift the lis pendens before March 5, 2020, when the government filed the Amended Bill of Particulars identifying the properties as assets directly traceable to the charged conduct rather than as substitute assets. Nor does he explain why he did not challenge that action by

the Government, based upon the arguments raised now, or file a motion seeking a <u>Monsanto</u>[14] hearing to require the Government to show that it had probable cause to believe that the restrained assets were directly traceable to the charged offenses.[15]

Balotin contends that the Government's Amended Bill of Particulars identifying the assets as directly traceable made it "more difficult" for him to challenge the lis pendens. <u>See</u> Motion at 25; Balotin's First Supplemental Brief at 15. However, he does not say he was unable to do so and appears to acknowledge that he could have.[16] Yet, Balotin did not.

In Balotin's First Supplemental Brief, Balotin devotes 13 pages to his argument that the Eleventh Circuit's decision in <u>Register</u> does not resolve his challenge that the lis pendens violated his Sixth Amendment right to counsel of his choice, <u>see</u> Balotin's First Supplemental Brief at 28-42, and he cites legal authority supporting the contention that a lis pendens, even if not a seizure, is a sufficient restraint to affect a defendant's ability to obtain counsel of choice,

---

[14]    <u>United States v. Monsanto</u>, 491 U.S. 600 (1989) (holding that it is constitutionally permissible to restrain assets pretrial if there is probable cause to believe the asset is forfeitable). As noted by the Supreme Court, since <u>Monsanto</u>, "lower courts have generally provided a hearing to any indicted defendant seeking to lift an asset restraint to pay for a lawyer." <u>Kaley v. United States</u>, 571 U.S. 320, 324 (2014).

[15]    Because the assets at issue were not identified as forfeitable in the Indictment, <u>Register</u> would not have precluded such a request based upon his Sixth Amendment right to counsel of his choice.

[16]    Balotin does not argue that the change "foreclosed" a challenge, he says that it foreclosed "any meaningful opportunity" for him or the titleholders of the properties to challenge the restraint. Motion at 26. But thinking he might not prevail is not a reason to forego seeking a potential remedy in a timely manner only to raise it post-verdict.

id. at 30 (citing <u>United States v. Fisch</u>, 2013 WL 5774876, *3-4 (S.D. Tex. Oct. 24, 2013)).  Yet, Balotin provides no explanation for the failure to raise this argument in a timely motion challenging the lis pendens at any time before the jury found him guilty.

Balotin criticizes the Government's argument that he should have filed a motion challenging the pretrial restraint of the properties as "blaming the victim for its own misbehavior." <u>Id.</u> at 5.  This argument fails to appreciate that Balotin's decision not to take any timely formal action to challenge the lis pendens either while the properties were identified as substitute assets or after the Government unilaterally, and in his view – improperly – recharacterized them as directly traceable to the offense is not inconsequential.[17]  Indeed, it is significant in two important ways.  First, as explained above, it supports the conclusion that Balotin actually had his counsel of choice.  Second, because Balotin never filed any motion seeking a release of the assets to obtain counsel,

---

[17]    In the context of the Motion, Balotin seems to use his failure to raise a pretrial challenge to the restraint on his assets as both a shield and a sword.  As a shield, he suggests that the Government's improper action somehow prevented him from making an affirmative record that he actually needed the assets subject to the lis pendens in order to obtain counsel which excuses his failure to do so now.  It does not.  As a sword, he argues that the assets subject to the lis pendens were untainted family assets and the Government has never made an evidentiary showing that they were actually traceable to the charged offenses.  Of course, Balotin never had to make the requisite financial need showing and the Government didn't have to make the evidentiary traceability showing for the simple reason that Balotin didn't file the motion that would have prompted the development of the record on both of these issues.  Balotin's failure to raise this important Sixth Amendment challenge in a timely manner results in a record wholly insufficient to find that the interests of justice warrant granting him a new trial.

he has never satisfied his burden of showing that without the encumbered assets he could not retain counsel of his choosing.

While courts differ in the way they address claims that a pretrial restraint on assets violates a defendant's Sixth Amendment right, the common threshold requirement is that a defendant must show "a bona fide need to utilize [seized] assets . . . to conduct his defense[.]" United States v. Farmer, 274 F.3d 800, 804 (4th Cir. 2001) (quoting United States v. Kirschenbaum, 156 F.3d 784, 792 (7th Cir. 1998)); see also United States v. Jamieson, 427 F.3d 394, 406 (6th Cir. 2005) (holding that a traceability hearing is warranted only when a defendant makes a threshold showing that he has no assets); United States v. Jones, 160 F.3d 641, 647 (10th Cir. 1998) (a defendant must show that "she has no assets, other than those restrained with which to retain private counsel and provide for herself and her family.").[18]  As explained by the Third Circuit

---

[18]     In determining whether a criminal defendant is entitled to a pretrial hearing on the legality of a restraint on assets needed to obtain counsel, the Eleventh Circuit has applied the four factor framework discussed in United States v. Bissell, 866 F.2d 1343 (11th Cir. 1989); United States v. Kaley, 579 F.3d 1246, 1252 – 55 (11th Cir. 2009) (Kaley I) (In Bissell, "this court clearly held that a defendant whose assets are restrained pursuant to a criminal forfeiture charge in an Indictment, rendering him unable to afford counsel of choice, is entitled to a pre-trial hearing only if the balancing test . . . is satisfied").  The importance of showing an actual need for the restrained assets to obtain counsel is evident from the Eleventh Circuit's application of the Bissell factors in Kaley I.  There, the Circuit Court explained that the trial court's consideration of the fourth Bissell factor required the court to weigh the prejudice suffered by the defendants due to the delay of a post-restraint hearing.  Id. at 1258.  Specifically, this required the court to weigh the defendant's ability to obtain counsel of his choice against the government's interest in recovering seized assets.  Id. at 1258-59.  Notably, this mattered because the Kaley's made an affirmative showing that due to the government's actions, they "were effectively shut out . . . from retaining" their counsel of choice.  Id. at 1258.  So, while the Eleventh Circuit may not have expressed the threshold for a Monsanto-type

> A hearing should be held 'only upon a properly supported motion by a defendant,' wherein he must (1) 'demonstrate to the court's satisfaction that [ ] he has no assets, other than those restrained, with which to retain private counsel and provide for [him]self and [his] family' . . .

United States v. Clark, 717 F.3d 790, 800 (3rd Cir. 2013).  The Second Circuit has similarly opined that a defendant seeking to obtain a "Monsanto or Monsanto-like hearing" must demonstrate that he or she does not have sufficient alternative assets to obtain counsel of choice.  United States v. Bonventre, 720 F.3d 126, 131 (2nd Cir. 2013).  Notably, this showing "requires more than a mere recitation; the defendant must make a sufficient evidentiary showing that there are no sufficient alternative, unrestrained assets to fund counsel of choice."  Id.  In Bonventre, the court explained that requiring a sufficient showing of financial need is appropriate because the Sixth Amendment is only implicated if the restraint actually affects a defendant's right to choose counsel.  Id.  There, because the defendant failed to disclose his net worth, provide a comprehensive list of his assets or explain how he had been paying his significant living expenses, the court determined that he failed to satisfy the threshold requirement that he show that the restrained funds were necessary to fund his defense.  Id. at 132 ("While the affidavits describe the aggregate balances of bank accounts enumerated in the government's

_____

hearing in the same manner as other circuits, the importance of showing a need for the assets to obtain counsel of choice is nevertheless a critical consideration.

submissions, they do not clarify whether Bonventre has access to other accounts, and, if so, their value."); <u>see also</u> <u>United States v. Omidi</u>, Case No. CR17-661(A)-DMG, 2021 WL 7629897, at *7 (C.D. Cal. June 15, 2021).

Here, the record before the Court is insufficient to support a conclusion that access to the properties encumbered by the lis pendens was necessary to secure Balotin's Sixth Amendment right. This is so because Balotin failed to fully disclose his assets pretrial and he has failed to make any effort to do so now in support of the Motion. As he did in the hearings before the Court, Balotin seeks a determination that his Sixth Amendment right was violated based only on the limited information he has chosen to share and without making any affirmative showing that the encumbered assets were truly necessary – and sufficient to enable him – to secure Baez as his chosen counsel. Because Balotin never filed a motion seeking the release of the encumbered properties, he never attempted to, nor was he required to, show that he needed those funds to obtain counsel. And, aside from the conclusory statements in his declaration that he needed the proceeds of the sale of one or more of the properties to retain Baez, he still submits no evidence of his financial circumstances or the value of the properties. Instead, Balotin relies on the Magistrate Judge's determination that he was eligible for appointment of counsel because he was financially unable to obtain counsel on his own. However, this preliminary finding is neither sufficient nor dispositive. <u>See</u> <u>Omidi</u>, 2021 WL 7629897, at *7, n.8.

Although Judge Toomey found Balotin indigent for the limited purpose of determining whether he should have counsel appointed, the record shows that Judge Toomey did not require Balotin to demonstrate that he lacked alternative assets to fund his defense based upon a full disclosure of his financial situation. Indeed, Judge Toomey's skepticism about whether Balotin was truly unable to obtain counsel is evident from his comments during the hearings and his cautions to Balotin about the Court's ability to revisit the issue and even require him to reimburse the Government if he was later determined to have had sufficient assets.  See Dec. 10, 2019 Tr. at 20 (Judge Toomey noting that Balotin's financial circumstances look suspicious); 24-25 (cautioning Balotin about the possibility of reimbursement); March 4, 2020 Tr. at 21-22 (discussing erroneous determinations of eligibility for court appointed counsel); 28-29 (cautioning Balotin again).

A review of the transcripts of the hearings in which the Court inquired into Balotin's financial situation as well as his other statements reflects that he has never disclosed much of the information necessary for the Court to conclude that the assets encumbered by the lis pendens were truly necessary for him to hire the attorney of his choosing.  During the first attempted colloquy, Balotin declined to answer questions about income insisting that he needed to speak to an attorney before doing so.  Dec. 5, 2019 Tr. at 6-9.  Later, Balotin provided only conclusory information, failed to disclose the income being generated from

the rental properties, and provided little information about bank accounts, including one account that, according to the Government, previously had a balance in excess of one million dollars. <u>See generally</u> Dec. 10, 2019 Tr. Additionally, Balotin disclosed that he owed $35,000 in a tax fee lien on his home. <u>Id.</u> at 5. Notably, although he stated that, "[I] really need a release of the <u>lis pendens</u> so I can get a hard money loan to pay off that note before we lose our house," <u>see id.</u> at 18, Balotin later paid the tax fee without the release of the lis pendens by borrowing the money from a family trust, <u>see</u> March 4, 2020 Tr. at 12. He told the Court that he was going to borrow $130,000 to pay an attorney who ultimately did not appear because of a conflict, without explaining how or from whom he was borrowing those funds. Dec. 10, 2019 Tr. at 6-7. He was able to borrow $150,000 from a family member to retain Fallgatter. March 4, 2020 Tr. at 17-20. And as of the date of the December 10th hearing, one of the properties, 5839 Cedar Oaks Drive, Jacksonville, Duval County, FL 32210-3808, did not have a lis pendens filed on it at all, <u>see</u> Notice of Lis Pendens (Doc. 141), but Balotin never identified it or its value, and has not explained even now why it could not have been used to allow him to obtain funds for legal counsel.

On March 4, 2020, when the Court inquired as to whether Balotin qualified for court-appointed counsel a second time, the Court asked Balotin to disclose the value of the family trust from which he previously borrowed money. <u>See</u> March 4, 2020 Tr. at 12. Balotin refused to do so. He stated that he couldn't

access it, did not see how it was relevant and when asked for an approximate value said, "Is that necessary? I don't know.  I can't access the money.  I'm not a beneficiary." Id. at 13-14.  Balotin claimed that all the assets in that trust had lis pendens filed on them, and the money for the tax fee sale came from his wife's separate trust.  Id.  In total he disclosed that there were four family trusts, none of which he was a beneficiary and one of which he was a trustee, but never disclosed their value or structure or explained why they could not be a source of funds for his defense in the same way one had been the source of funds to avoid the tax sale.  Id. at 14.[19]  When asked to identify the family member who lent him the $150,000 to hire Fallgatter, Balotin refused to do so.  Id. at 17-20.  And despite suggesting to the Court on March 4, 2020, that he would not have access to the $132,000 remaining from the funds borrowed to retain Fallgatter, Balotin was able to hire Rashbaum the following month at an undisclosed fee with funds borrowed from an unidentified relative.  To this day, Balotin has never provided the Court with full disclosure of his financial circumstances.

While Balotin seems to suggest that the Government's decision to assert that the properties were directly traceable to the charged conduct negated the need for this inquiry prior to the trial, he fails to explain why in filing the instant Motion seeking a new trial based on the contention that the Government's

---

[19]    Conversely, these are the same trusts that hold the restrained assets and Balotin has never explained how properties held by those trusts could be used to allow him to secure counsel.

action deprived him of his Sixth Amendment right to counsel of his choice, he makes no showing of the requisite need for the assets to retain counsel. Indeed, Balotin still opts not to provide a disclosure of his net worth, assets, or the information regarding the trusts that he previously refused to provide. Nor has he explained how he has paid his living expenses throughout this lengthy period.[20] Bonventre, 720 F.3d at 132.

Also of note is that Balotin has retained three additional law firms to litigate this Motion. Balotin does not offer any evidence to the Court regarding how he is now able to retain all these attorneys or that these attorneys are representing him pro bono or at a discounted rate. The record here is similar to that found insufficient to warrant a release of funds purportedly needed to retain counsel in United States v. Hernandez-Gonzalez, Case No. 16-20669-CR-SCOLA/TORRES, 2017 WL 2954676, at *7 (S.D. Fla. 2017), report and recommendation adopted, 2017 WL 3446815 (S.D. Fla. Aug. 10, 2017). The court concluded:

> Here, the Defendant has three lawyers currently handling his criminal case and has failed to provide any proof of his net worth to the Court. Defendant has not proffered any verified financial affidavits for himself in support of his Motion and no banking statements that show a lack of available assets. Complete financial disclosure requires that the Defendant identify his assets, liabilities, sources of income, net worth, whether he has access to financial accounts, and the expected costs of his defense team.

---

[20]   Balotin claimed to earn about $1,000 per month but to owe $10,000 in property taxes, $183,000 to the IRS, and $60,000 on credit cards, and to have phone, utility and gas expenses of $1,000 per month. Financial Affidavit dated March 4, 2020 (Doc. 181).

Id. at 7 (citing Bonventre, 720 F.3d at 133). Balotin has provided almost none of this information, and what he has provided is insufficient. Id.; see also United States v. Sachy, Case No. 5:18-cr-48-CDL-CHW-1, 2022 WL 17177262, at *2 (M.D. Ga. Nov. 23, 2022) (finding information similar to that which Balotin has provided "failed to meet the threshold requirement"); Bonventre, 720 F.3d at 132-133 (finding information more detailed and specific than that provided by Balotin to be insufficient).

Under Luis, the pretrial restraint of untainted assets needed to obtain counsel of a defendant's choice violates the Sixth Amendment. See Luis v. United States, 578 U.S. 5, 23 (2016). And since Monsanto, courts have given a defendant a hearing to litigate whether there is probable cause for the assertion that the assets are properly restrained as forfeitable (i.e. traceable to the offense) if the defendant shows the assets are needed to obtain counsel. Kaley, 571 U.S. at 324; United States v. Kaley, 677 F.3d 1316, 1321 (11th Cir. 2012) (Kaley II) ("In Bissell this Court held that, when a restraint on a defendant's assets prevents him from retaining counsel of choice, due process requires a pretrial hearing if the four-factor balancing test enunciated in Barker v. Wingo, 407 U.S. 514 (1972) weighs in favor of a hearing.") (citing Bissell, 866 F.2d at 1353)). In either circumstance, however, the defendant must make the threshold showing that without the release of the assets, he

cannot hire counsel of his choice.  <u>Farmer</u>, 274 F.3d at 804 (if defendant does not make "a threshold showing that [he] is without funds to hire the attorney of his choice[.]" then he has no right to a <u>Monsanto</u> hearing); <u>Kirschenbaum</u>, 156 F.3d at 792 (explaining that defendant must "show a bona fide need to utilize [seized] assets … to conduct his defense" to be entitled to a <u>Monsanto</u> hearing); <u>Jones</u>, 160 F.3d at 647 (defendant must demonstrate "she has no assets, other than those restrained, with which to retain private counsel and provide for herself and her family" and that there is "a bona fide reason to believe the grand jury erred in determining that the restrained assets" are properly restrained as forfeitable).  Balotin has never made that showing.  He did not file a motion seeking to release the lis pendens to allow him to use the properties to hire counsel when they were restrained as substitute assets.  And, he did not argue that their later characterization as directly traceable was improper or that it violated his Sixth Amendment right.  In either case, he would have had to provide "definite, specific, detailed and non-conjectural" evidence, <u>United States v. Unimex, Inc.</u>, 991 F.2d 546, 551 (9th Cir. 1993), showing that he, absent release of the assets, was unable to obtain counsel of his choice, <u>see</u> <u>United States v. Lindell</u>, 766 F. App'x 525, 528-29 (9th Cir. 2019).  He simply has not done so.

In sum, Balotin's belated contention that the Government violated his Sixth Amendment right to counsel of his choice does not warrant a new trial.

The record does not support Balotin's claim that Baez was his counsel of choice. Rather, the record supports only a conclusion that Daniel Rashbaum and his firm were the attorneys Balotin chose, and he was represented by those very attorneys throughout the trial and verdict. The record also does not support a finding that the filing of the lis pendens prevented Balotin from affording counsel, much less counsel of his choice.[21]  Even assuming the properties at issue were wrongfully restrained, Balotin has failed to show that his Sixth Amendment right to counsel of his choice was wrongfully denied.  See United States v. Marshall, 754 F. App'x 157, 161 (4th Cir. 2018) ("Luis does not apply if the defendant did not need the funds to retain counsel.").  And Balotin fails to show any cause for his decision to wait to raise this Sixth Amendment challenge only after he was convicted at trial.  See Lindell, 766 F. App'x at 528 (noting that defendant forfeited the Sixth Amendment challenge by failing to raise it until after trial); Marshall, 754 F. App'x at 161 ("[A]t no time in district court did Marshall express dissatisfaction with counsel or claim that he was unable

---

[21]     Equally evident, as noted previously, is that the record is insufficient to show that Balotin could have hired Baez without the lis pendens.  Balotin has never attempted to make a showing that the value of the properties he sought to sell were sufficient to cover Jose Baez's fee.  Nor did he respond to the Government's argument that he failed to present evidence that the properties which were held in trust would have been available to him if the lis pendens were lifted.  Government's First Supplemental Brief at 24-25.  Without this information, the Court cannot determine that his inability to sell the properties was what precluded Balotin from affording Baez.  Finally, the Court observes that at least one court has concluded that a defendant's inability to access funds held in a trust did not implicate the Sixth Amendment because it protects only a defendant's right to use "his own money."  Omidi, 2021 WL 7629897, at *6 (emphasis in original).  Balotin could have addressed these important factual and legal issues in the Motion.  But, he did not do so.

to pay for substitute counsel. . . .  Because Marshall was represented by the counsel of his choice, there was no need for the seized funds and, thus, no <u>Luis</u> error.").  For all of these reasons, to the extent Balotin seeks a new trial based on his contention that the Government improperly restrained the assets that were subject to the lis pendens, the Motion is due to be denied.

## II.   **Balotin's Trial Specific Arguments**

The Court turns now to Balotin's trial specific arguments.  In the Motion, Balotin asserts that his "verdict was based on several legal errors that together deprived [him] of a fair trial."  <u>See</u> Motion at 1-2.  According to Balotin, "[i]t is therefore in the interest of justice to vacate [his] conviction and order a new trial as to both Counts One and Twelve."  <u>Id.</u> at 2.  Rule 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[22]  Fed. R. Crim. P. 33(a).  The "interest of justice" standard is broad, and the trial court is vested with substantial discretion in determining whether to grant the motion.  <u>See</u> <u>United States v. Vicaria</u>, 12 F.3d 195, 198 (11th Cir. 1994); <u>United States v. Martinez</u>, 763 F.2d 1297, 1312 (11th Cir. 1985).  Thus, the court considers whether, based on Balotin's arguments, "the verdict must be set aside 'in the interest of

---

[22]     As the Eleventh Circuit recognized, there are two grounds for granting a new trial under Rule 33: "interest of justice" and newly discovered evidence.  <u>See</u> <u>United States v. Hall</u>, 854 F.2d 1269, 1270 (11th Cir. 1988).  In this case, the only ground asserted in the Motion is the "interest of justice."  <u>See</u> <u>generally</u> Motion.

justice.'" <u>United States v. Green</u>, 275 F. App'x 898, 899 (11th Cir. 2008) (internal quotations omitted); <u>see</u> <u>also</u> <u>Vicaria</u>, 12 F.3d at 198; <u>Hall</u>, 854 F.2d at 1271 (concluding that the trial "court has very broad discretion in deciding whether there has been a miscarriage of justice"); <u>Martinez</u>, 763 F.2d at 1312.

When a defendant challenges the weight of the evidence in a motion for a new trial, the court "need not view the evidence in the light most favorable to the verdict" and "[i]t may weigh the evidence and consider the credibility of witnesses." <u>United States v. Hernandez</u>, 433 F.3d 1328, 1335 (11th Cir. 2005) (quoting <u>Martinez</u>, 763 F.2d at 1312); <u>United States v. McMahon</u>, No. 8:04-cr-348-T-24TGW, 2007 WL 57778, at *1 (M.D. Fla. Jan. 5, 2007). Yet, the court "'may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" <u>Hernandez</u>, 433 F.3d at 1336 (quoting <u>Martinez</u>, 763 F.2d at 1312-13). Indeed, the Eleventh Circuit may find that a district court "overreached its authority by granting a new trial" if "the record reveals that the evidence did not <u>preponderate heavily</u> against the jury's verdict." <u>Id.</u> (quoting <u>United States v. Cox</u>, 995 F.2d 1041, 1044 (11th Cir. 1993) (emphasis added)). Motions for a new trial based on the weight of the evidence are to be granted "'sparingly and with caution, doing so only in those really 'exceptional cases.'" <u>Id.</u> at 1336-37 (quoting <u>Martinez</u>, 763 F.2d 1313).

## A. Jury Instructions

Balotin first contends that the Court erred with regard to several of its instructions to the jury. See Motion at 2-18. Specifically, Balotin argues that the Court erred in declining to give his requested jury instruction on the good faith defense and also by "sua sponte" instructing the jury on the good faith reliance on advice of counsel instead. See id. at 2-12. Balotin maintains that this was reversible error because the evidence presented at trial warranted a good faith instruction, the advice of counsel instruction was insufficient where it is "merely a subset of the broader good faith defense," and good faith was a proper defense to Count One because the intent to defraud is an element of conspiracy to commit health care fraud. See id. at 2-9. In addition, Balotin contends that by giving the advice of counsel instruction and not the good faith instruction, "the Court was in effect encouraging the jury to disregard evidence of Defendant Balotin's good faith if the jury found that Balotin had not met the burden of qualifying for the affirmative advice of counsel defense." Id. at 9-11. According to Balotin, the Court left the jury to disregard any evidence of good faith if it was not based on the advice of counsel because the jury received no instruction on how to consider any other good faith defense. Id. at 11. Even if the Court does not find that its refusal to give the good faith instruction was erroneous, Balotin urges the Court to grant the Motion if "simply because 'on reflection' and after reconsideration the Court concludes that it should have

given the requested pattern good faith instruction as the theory of defense." Id. at 12.

Balotin additionally asserts that it was error for the Court to limit the application of the advice of counsel instruction to the anti-kickback charges against Balotin and his co-defendant Greg Carter. See id. at 12-14. Balotin argues that by failing to instruct the jury that good faith reliance upon advice of counsel is a defense to the conspiracy charge in Count One, the Court

> wrongly told the jury not to consider advice provided by attorney Marty Dix to Balotin on any issue other than compliance with the Anti-Kickback Act, even though Dix's advice was also and equally relevant to other issues involved in the Count One conspiracy charge.

Id. at 13-14. Balotin further contends that the Court erred in instructing the jury on deliberate ignorance because there was no evidence that Balotin "purposely avoided learning that sales representatives were making unlawful payments to patients or doctors." Id. at 16. Instead, Balotin contends that Jeremy Bezroukoff was "unequivocal" that Balotin knew about the illicit nature of the payments and Bezroukoff's testimony suggested only that Balotin pretended not to know. Id. at 16-18. Regardless, Balotin maintains that the Court's wording of its deliberate ignorance instruction was improper and "confused the jury on the need to find that Mr. Balotin affirmatively and willfully joined the conspiracy." Id. at 18.

In the Response, the Government first argues that the Court did not err in relying on Zoriano[23] and Jordan[24] in declining to instruct the jury on the defense of good faith, and that it correctly noted that the instruction was covered by the willfulness instruction.  Response at 3-4.  In addition, the Government contends that the deliberate ignorance instruction was appropriate where there was evidence of "Balotin intentionally walking out of the room and not wanting to hear about the methods that were being used to recruit 'patients' and to generate prescriptions." Id. at 4.  The Government maintains that the Court's instruction to the jury regarding the good faith reliance upon advice of counsel also was proper.  Id. at 4-5.

In considering a motion for a new trial on the grounds of an erroneous jury instruction, a court must examine the instruction to determine whether it "adequately [presents] the issues and the law to jurors."  United States v. Hewes, 729 F.2d 1302, 1316 (11th Cir. 1984).

> Generally, district courts "have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts," and [the Eleventh Circuit] will not reverse a conviction on the basis of a jury charge unless "the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process."

---

[23]   United States v. Zoriano, 817 F. App'x 817 (11th Cir. 2020).
[24]   United States v. Jordan, 582 F.3d 1239 (11th Cir. 2009).

United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000) (citing United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993)).   "[An erroneous jury] charge entitles a defendant to a new trial on the count in question only 'when a reasonable likelihood exists that the jury applied the instruction in an improper manner.'" United States v. Leonard, 138 F.3d 906, 910 (11th Cir. 1998) (quoting United States v. Quinn, 123 F.3d 1415, 1428 (11th Cir. 1997)).   Significantly,

> [r]efusing to give a proposed "instruction is reversible error only when (1) the proposed instruction is correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense.

United States v. US Infrastructure, Inc., 576 F.3d 1195, 1212 (11th Cir. 2009).

### i.   Refusal to Give the Good Faith Instruction

In the Motion, Balotin argues that the interests of justice require that the Court grant him a new trial because the Court improperly declined to instruct the jury regarding his good faith defense.   Motion at 2-12.   Balotin asserts that the evidence presented warranted the instruction and the Court improperly "belie[ved] that conviction for the Count One conspiracy to commit health care fraud did not require proof" that the defendants acted with the "intent to defraud."   Id. at 5.   Balotin attempts to distinguish two cases cited by the Court and contends that they are inapplicable because the charged offenses in those cases did not require an intent to defraud as an element.   Id. at 6-8.

Preliminarily, the Court notes that Balotin has not identified any evidence that would warrant an instruction on good faith.[25]  See generally Motion.  In the Motion, Balotin points to evidence that he knew certain conduct was unlawful and took steps to prevent that conduct from occurring. Specifically, he cites evidence that he stated that "you cannot pay patients or doctors for any scripts," an email in which Marty Steinberg said, "there is never to be any payment made to a Doctor or patient . . . ," that Balotin stated at a meeting with sales representatives that "patients and doctors could not get paid for prescriptions," and that Balotin fired a sales representative for telling people he would pay them for getting prescriptions.  Id. at 2-4.  But, Balotin does not concede that he knew patients or doctors were being paid but honestly believed such conduct was lawful.  To the contrary, Balotin denies that he engaged in, or was aware that others engaged in, the conduct at issue at all. He fails to explain how a good faith instruction would be warranted under these circumstances.  The Eleventh Circuit addressed such a situation in United States v. Etienne, 551 F. App'x 517, 521 (11th Cir. 2014), albeit in an

---

[25]    To the extent Balotin cites United States v. Paradies for the proposition that "a defendant is entitled to a theory of defense charge for which there is any evidentiary foundation, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility," he cites to the Court's summary of the defendant's argument.  Motion at 8-9 (citing 98 F.3d 1266, 1287 (11th Cir. 1996), as amended (Nov. 6, 1996) (internal citations and quotations omitted)).  The Eleventh Circuit in Paradies held that the defendant was "not entitled to a reversal based on the district court's failure to give the proposed instruction." 98 F.3d at 1287 (emphasis added).

unpublished decision.  The court concluded, "[t]here was no foundation in the evidence to support [a jury instruction on good faith].  Etienne did not concede that she had signed false treatment reports; instead, she argued that she had been an honest employee whose signature had been forged on checks and false treatment reports."  Id.  Because the good faith defense found no foundation in the evidence, Balotin's argument that the Court erred in declining to instruct the jury on the good faith defense is unavailing.

Moreover, although Balotin asserts in the Motion that intent to defraud is an element of the conspiracy charge to which good faith was his theory of defense, Balotin's own proposed good faith instruction described his defense as one that negates willfulness.  See Defendant Scott Balotin's Proposed Jury Instructions (Doc. 373; Balotin's Proposed Jury Instructions) at 25.  Indeed, Balotin's requested instruction expressly applied to "willfulness," and is modeled after the Eleventh Circuit's pattern instruction titled "Good-Faith Defense to Willfulness."  See id.  His proposed instruction stated:

**Good-Faith Defense to Willfulness**

Good faith is a complete defense to the charge of conspiracy to commit health care fraud and to the charges of violating the Anti-Kickback Statute, since good faith on the part of a Defendant is inconsistent with willfulness, and willfulness is an essential part of the charges. If a Defendant acted in good faith, sincerely believing himself to be in compliance with the law, then the Defendant did not act "willfully."

> An honestly held opinion or an honestly formed belief cannot be willful – even if the opinion or belief is mistaken. Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish willfulness.
>
> The burden of proof is not on the Defendant to prove good-faith intent because the Defendant does not need to prove anything. The Government must establish beyond a reasonable doubt that the Defendant acted willfully as charged.
>
> If you find beyond a reasonable doubt that the Defendant specifically intended to do something that is against the law and voluntarily committed the acts that make up the crime, then the element of "willfulness" is satisfied.

Id.  Notably, the Eleventh Circuit provides a pattern instruction for the "Good-Faith Defense to Charge to Intent to Defraud," see 11th Cir. Pattern Jury Instr. Criminal – Special Instruction No. 17 (2021 Ed.), which Balotin did not primarily rely on in crafting his proposed instruction, see Balotin's Proposed Jury Instructions at 25.  Balotin was aware of the intent to defraud pattern instruction because he cited to it in his proposed good faith instruction.  Id. However, in incorporating some of its language, he explicitly deleted any reference to the "intent to defraud."  See id.  The Eleventh Circuit's pattern instruction on the "Good-Faith Defense to Charge to Intent to Defraud" states, in relevant part:

> An honestly held opinion or an honestly formed belief cannot be fraudulent intent – even if the opinion or belief is mistaken. Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent.

See 11th Cir. Pattern Jury Instr. Criminal – Special Instruction No. 17 (2021 Ed.). Balotin specifically modified the pattern instruction to remove the two references to "fraudulent intent" and instead replaced them with the words "willful" and "willfulness." Balotin's Proposed Instructions at 25. Moreover, Balotin did not object to the Court's instruction to the jury regarding the conspiracy to commit health care fraud charge despite the fact that it did not include "intent to defraud" as an element. Rather, the instruction followed the Eleventh Circuit pattern instructions for 18 U.S.C. § 1349. Court's Final Jury Instructions (Doc. 521) at 15-18. In fact, Balotin's proposed jury instructions did not mention an "intent to defraud" at all. See generally Balotin's Proposed Jury Instructions. Thus, it is unclear how he can now contend that the instruction was in error because it should have required proof of an intent to defraud.

Balotin also fails to identify any legal authority in which a trial court was determined to have reversibly erred in not giving a good faith instruction in relation to a charge of conspiracy to commit health care fraud. See generally Motion. Moreover, he ignores authority establishing that "'a theory of the defense instruction is not required 'when the charge given adequately covers the substance of the requested instruction.'" US Infrastructure, Inc., 576 F.3d at 1212 (quoting United States v. Ndiaye, 434 F.3d 1270, 1293 (11th Cir. 2006)). As to the need for a good faith instruction, the Eleventh Circuit has held that

where a court has defined the terms "willfulness" or "intent to defraud" in instructing the jury, the good faith defense is "substantially covered by other instructions."   See United States v. Hill, 643 F.3d 807, 854 (11th Cir. 2011) ("[T]he jury plainly had to rule out the possibility that the defendants actually harbored a good faith belief in the legitimacy of the scheme before the jury could have found that they made the false statements wilfully[sic] and with the intent to influence the lenders."); see also United States v. McNair, 605 F.3d 1152, 1201 n. 65 (11th Cir. 2010) ("The court defined 'intent to defraud' as 'to act knowingly and with the specific intent to deceive someone.' Because a finding of specific intent to defraud necessarily excludes a finding of good faith, [the defendant's] requested instruction was 'substantially covered by other instructions that were delivered,' and [the defendant] has shown no error in the refusal to give his requested good faith charge.").   Here, at the Charge conference, the Court explained:

> the willful instruction does require that the defendant intend to do something that the law forbids and to act with bad purpose, which would be inconsistent with good faith. And so for that reason, I don't think the additional good-faith instruction is proper or necessary.

Transcript of Jury Trial (Volume XI) (Doc. 593) at 7.   Ultimately, the Court instructed the jury that

> The word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

> The word "willfully" means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law. While a person must have acted with the intent to do something the law forbids before you can find that the person acted "willfully," the person need not be aware of the specific law or rule that his conduct may be violating.

Court's Final Jury Instructions at 30.  In addition, the Court instructed the jury on the substantive offense of health care fraud and defined the "intent to defraud" to mean:

> to do something with the specific intent to use false or fraudulent pretenses, representations, or promises, to cause loss or injury. Proving intent to deceive alone, without the intent to cause loss or injury, is not sufficient to prove intent to defraud. To act willfully means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law – and not out of mistake or ignorance.

Id. at 19-20.  Thus, even if Balotin was entitled to an instruction on the defense of good faith, it was substantially covered by the Court's instructions.  As such, Balotin's argument that the Court's refusal to instruct the jury on the good faith defense is without merit.

### ii.   Advice of Counsel Instruction

Balotin next contends "[t]he combination of the Court sua sponte giving its advice of counsel instruction while simultaneously refusing to give the requested pattern good faith instruction harmed Defendant Balotin in several

ways."[26] Motion at 9-10. According to Balotin, "'the jury could have been misled' into thinking that the only good faith defense available to Defendant Balotin was the advice of counsel defense." Id. at 10 (quoting United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995)). Additionally, Balotin argues that it "wrongly suggested to the jury that no good faith defense was available to Defendant Balotin if the jury found that Balotin" had not met the required elements of the advice of counsel instruction. Id. Finally, Balotin argues that while the Court accurately described the advice of counsel defense as an affirmative defense that "Balotin had to earn the right to raise," the same does not go for the defense of good faith. Id. at 11.

Balotin's arguments that he was harmed by the advice of counsel instruction depend largely on his entitlement to the good faith instruction. As just discussed, Balotin was not entitled to the good faith instruction and even if he was, it was substantially covered by other instructions given. Moreover, the advice of counsel instruction did not apply to either of the offenses of which Balotin was convicted. Balotin fails to explain how an instruction expressly directed towards different charges impacted the charges for which he was

---

[26]    Contrary to Balotin's assertion in the Motion, the Court's decision to instruct the jury on the good faith reliance upon advice of counsel was not sua sponte. Balotin's co-defendant, Greg Carter, requested the instruction in his proposed jury instructions. See Defendant Greg Carter's Proposed Jury Instructions (Doc. 374) at 49. Because counsel for Balotin elicited testimony from Carter's witness, Marty Dix, regarding advice he also gave to Balotin, the Court determined it was applicable to both defendants. Balotin raised no objection to that determination during the charge conference.

convicted.  Regardless, Balotin does not cite to any authority in support of his argument and merely speculates that the instruction would confuse a jury or that a jury would not be able to follow the instructions provided.  This is insufficient to "overcome the presumption that the jury followed its instructions."  See United States v. Stone, 9 F.3d 934, 941 (11th Cir. 1993).

Balotin also argues that it was error for the Court to only apply the advice of counsel instruction to the anti-kickback charges.  See Motion at 13.  In support, Balotin contends that

> [the Court] wrongly told the jury not to consider advice provided by attorney Marty Dix to Balotin on any issue other than compliance with the Anti-Kickback Act, even though Dix's advice was also and equally relevant to other issues involved in the Count One conspiracy charge.

Id. at 13-14.  Balotin does not identify any specific advice provided by Marty Dix on issues other than compliance with the Anti-Kickback Act or attempt to explain how the evidence presented at trial regarding Dix's advice relates to the conspiracy or the money laundering charges.  The evidence presented at trial which warranted the advice of counsel instruction related to the payment of commissions to employees, anti-kickback regulations, and the relevant safe harbors.  See Transcript of Jury Trial (Volume IX) (Martin Dix) (Doc. 600; Dix Tr.).  Notably, Dix described the relevant advice that Balotin sought from him as regarding

> CasePark's relationship with Carter's Pharmacy and any other provider pharmacy that provides payments to CasePark and CasePark's compensation structure for its employees, consultants, and independent contractors.

Dix Tr. at 166. Balotin sought information from him regarding "whether he and his sales reps c[ould] be paid commissions if they're W-2 employees," to which Dix advised

> . . . if you were paying commissions to nonemployees, it could be seen as an illegal kickback, and that's prohibited under federal and state law.
>
> But if you use your employees, then the -- there is a -- what's called a safe harbor for payments to employees. It's what the drug companies use with their drug reps. You know, their drug reps are employees. They pay them commissions for trying to get work, you know, for selling their drugs. And it's paid on a commission basis.

Id. at 167-68. Thus, Balotin does not point to, and the Court has not identified, any evidence warranting the advice of counsel instruction on a charge other than the anti-kickback charge and Balotin is not entitled to a new trial on this basis.

### iii.    Deliberate Ignorance Instruction

Balotin next argues that the Court erred in giving the jury a "deliberate ignorance" instruction.  Motion at 14-18.  In support, Balotin contends although Bezroukoff provided testimony that Balotin purposely left the room when sales representatives discussed paying patients, he also testified that Balotin "was very aware about the widespread amount of people that were paying doctors

and patients." Id. at 15 (citing Transcript of Jury Trial (Volume VI-B) (Jeremiah Daniel Bezroukoff) (Doc. 585; Bezroukoff Tr.)).   According to Balotin, this testimony does not reflect deliberate ignorance but "rather feigned ignorance of what the witnesses insisted was Mr. Balotin's actual knowledge of kickbacks." Id. at 16.  Balotin further contends,

> Bezroukoff was unequivocal that Mr. Balotin had full knowledge of the payments and their illicit nature. By leaving the room amid mention of those payments, Mr. Balotin (according to Bezroukoff) was not seeking to avoid the truth, but instead was pretending not to know it. Under these circumstances, the deliberate ignorance instruction was error.

Id. at 16.  Balotin acknowledges that any error in instructing a jury on deliberate ignorance is harmless "where the jury is also instructed on a theory of actual knowledge, and where there is sufficient evidence to support the conviction under that theory." Id. at 17.  However, Balotin argues that evidence of actual knowledge only related to the payment of kickbacks, which is insufficient alone to establish a conspiracy to commit health care fraud.  Id. (citing United States v. Medina, 485 F.3d 1291, 1298 (11th Cir. 2007)).  Finally, Balotin argues that the Court's inclusion of the words "and participates in the scheme" in the deliberate ignorance instruction "confused the jury on the need to find that Mr. Balotin affirmatively and willfully joined the conspiracy." Id. at 17-18.

Eleventh Circuit precedent regarding the use of the deliberate ignorance jury instruction is well-developed. In <u>United States v. Rivera</u>, the court discussed the rationale behind the use of the instruction as follows:

> The deliberate ignorance instruction is based on the alternative to the actual knowledge requirement at common law that "'if a party has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge.'" It is premised on the belief that acts conducted under the guise of deliberate ignorance and acts committed with positive knowledge are equally culpable. "To act 'knowingly,' therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question."

944 F.2d 1563, 1570 (11th Cir. 1991) (internal citations omitted).  Following this reasoning, the court concluded that the instruction is warranted in cases where the evidence is sufficient to support the inference that the defendant "was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts" necessary to obtain positive knowledge. <u>Id.</u> at 1571 (citing <u>United States v. Alvarado</u>, 838 F.2d 311, 314 (9th Cir. 1987)).  Indeed, the Eleventh Circuit has repeatedly confirmed that the instruction is proper where "the evidence supports both actual knowledge and deliberate ignorance." <u>See</u> <u>United States v. Morales de Carty</u>, 300 F. App'x 820, 829 (11th Cir. 2008) (quoting <u>Arias</u>, 984 F.2d at 1143).  Notably, the Circuit Court also has instructed that in a conspiracy case, the "deliberate ignorance instruction is permissible to establish that a defendant knew of the unlawful

purpose of the conspiracy, but not to establish that he willfully joined in the conspiracy." ¹United States v. Willner, 795 F.3d 1297, 1315 (11th Cir. 2015).

If, as Balotin contends, the evidence presented only establishes his actual knowledge of the payment of kickbacks, this would not warrant a rejection of a deliberate ignorance instruction with respect to the conspiracy to commit health care fraud charge.  This is so because knowledge of kickbacks does not preclude a finding that Balotin was aware of the high probability that the prescriptions being obtained via the kickbacks were fraudulent and purposely contrived to avoid learning this fact.

Moreover, contrary to Balotin's assertion, the evidence of actual knowledge was not limited to the payment of kickbacks. As Balotin notes, Bezroukoff testified that Balotin knew of payments to patients and doctors "and their illicit nature."  Motion at 16.  Soni Simsir testified that while she was at Greg Carter's pharmacy, Balotin received a phone call from Dr. Kulich who was upset that he received a prescription from Balotin for a child, or dead patient, and the prescription was continuing to be filled for months.  Transcript of Jury Trial (Volume III) (Sonsoles "Soni" Simsir) (Doc. 590; Simsir Tr.) at 21.   Simsir also testified that it caused issues for Balotin when Dr. Kulich wrote prescriptions and "something was not checked off that actually helped adjudicate it at a higher reimbursement amount."  Id. at 20.  Simsir further testified that Balotin made sure the prescription pads they provided to doctors

included ingredients with the highest reimbursement rates.  Id. at 40.  When Simsir picked up prescription pads from Balotin's house they would discuss the various changes to the prescription pads.  Id. at 41.  Specifically, Simsir testified:

> And Scott [Balotin] would be the one that was telling me that, "Okay. Let me make sure that this is adjudicated correctly." Or, "We got only this much for this prescription so we've got to change it because it didn't check off this one."  Or, "This one doesn't have this ingredient."

Id. at 41. She also testified that,

> Scott would just let me know, "okay, look. Just sent the prescription through a - - an insurance company, and it didn't get reimbursed good because it's missing this ingredient.  So I tried one with this one, and - - with this type of ingredient, and this one is reimbursed good."

> So he would - - Scott would stay at, like, Case and - - Park and King, and I would call him there at times. And Scott would tell me, "Okay. I'm calling the insurance company right now trying to get this prescription adjudicated. But I happened to find out that this mixture of this, this, and this ingredient pays a lot better. So make sure when you go to the doctor's office, you tell them to check off this one."

Id. at 43.  Simsir testified that Balotin updated the prescriptions according to what paid the most because the patient did not care what they were getting because they were not going to use it.  Id. at 59-60.

Derwin Allen testified that he had a conversation with Balotin about which prescriptions should be selected on a given prescription form.  Transcript of Jury Trial (Volume IV) (Derwin Allen (Doc. 597; Allen Tr.) at 114.  He testified that Balotin determined what prescriptions were generated by trial and error

and seeing what got paid out the most.  Id. at 127-28.  David Stevens testified that Balotin stated that he had a fax machine at his house and that he could make corrections to prescriptions and send them to the pharmacies himself. Transcript of Jury Trial Proceedings (Volume V) (David Stevens) (Doc. 584; Stevens Tr.) at 287.  Stevens also testified that Balotin told him some of the sales representatives would set up at places right outside of the military base and bring attractive girls to lure them to tables and pitch the pain creams to them because they had TRICARE.  Id. at 286.  Bezroukoff testified that while he was working for Balotin he was making over $100,000 per month, Bezroukoff Tr. at 56, and there was evidence that Balotin made $810,816.12 in just two weeks.  See Transcript of Jury Trial (Volume II) (Peter J. Corigliano Jr.) (Doc. 596; Corigliano Tr.) at 73, Exhibit 5B.  Sales representatives and patients like Pablo Ortiz testified that patients did not need the creams, Transcript of Jury Trial (Volume V) (Pablo Ortiz) (Doc. 584; Ortiz Tr.) at 140, and Luis Mora testified that he was instructed to give the prescriptions to patients to have them filled out based on what they thought they needed.  Transcript of Jury Trial (Volume VII) (Luis Mora) (Doc. 591; Mora Tr.) at 126.  Further, Bezroukoff testified that Balotin's "way of dealing" with conversations regarding payments to patients "would be walking out of the room or making himself busy with it, pretending that he didn't hear it.  It was a very don't ask, don't tell type policy at the office."  Bezroukoff Tr. at 108.  This evidence suggests that Balotin was

actually aware of the fraudulent nature of the prescriptions, but if he was not, then he was aware of a high probability of fraud and purposely avoided learning of it, such that an instruction on deliberate ignorance was warranted.

With regard to the Balotin's challenge to the wording of the instruction, he provides no authority in support of his argument.  Nor does he explain how the language "and participates in the scheme" undermines the Court's instruction that the jury must find that "the Defendant knew the unlawful purpose of the plan and willfully joined in it."  Court's Final Jury Instructions at 15-16.  In the instructions, the Court repeatedly explained that the deliberate ignorance instruction pertained to <u>knowledge</u>:  "[i]f a Defendant's <u>knowledge</u> of a fact is an essential part of a crime, it is enough that the Defendant was aware of a high probability that the fact existed – unless the Defendant actually believed the fact did not exist," deliberate ignorance "is the equivalent of <u>knowledge</u>," "[s]o you may find that a Defendant <u>knew</u> about the fraudulent scheme if . . . ." <u>Id.</u> at 31 (emphasis added).  The Court also stated, "[b]ut I must emphasize that negligence, carelessness, or foolishness is not enough to prove that the Defendant <u>knew</u> about the existence of the fraudulent scheme." <u>Id.</u>  In <u>United States v. Guerra</u>, the Eleventh Circuit found similar instructions sufficiently "applied only to the 'issue of whether [the defendant] knew of the unlawful purpose of the conspiracy' and not to the separate 'issue of whether

she willfully joined in the conspiracy.'"  No. 21-10921, 2022 WL 244082, at *5

(11th Cir. Jan. 27, 2022) (citing <u>Willner</u>, 795 F.3d at 1315).  Specifically,

> [t]he district court instructed the jury that to convict, it had to find
> both that Guerra "knew the unlawful purpose of the plan and
> willfully joined in it."  The court then explained in the deliberate
> ignorance instruction that the jury could find that Guerra had the
> requisite knowledge of a fact if it determined that she "had every
> reason to know but deliberately closed her eyes."

<u>Id.</u>  Thus, Balotin's contention that the jury may have thought evidence of his

"deliberate ignorance" was sufficient to establish that he willfully joined the

conspiracy is without merit.

## B. Evidence regarding the Government's Key Witness

In addition to challenging the Court's jury instructions, Balotin argues

that Bezroukoff was a key government witness whose testimony should be

deemed completely unreliable due to facts disclosed in the report of an

evaluation completed after the trial and filed as part of Bezroukoff's motion for

downward departure in his separate case.  <u>See</u> Motion at 18-20; <u>see</u> <u>also</u> <u>United

States v. Bezroukoff</u>, Case No. 3:19-cr-215-MMH-PDB, Doc. 57 (Nov. 18, 2021).

According to Balotin, the interests of justice require a new trial in which

Bezroukoff "can be cross-examined fairly and adequately about all the

limitations on his ability to testify accurately contained in Dr. Kohn's report."

Motion at 20.  In response, the Government asserts that "Bezroukoff was one

of many witnesses who testified at trial, all of whom presented damaging

evidence against Balotin.  Bezroukoff was cross-examined thoroughly, and his testimony was articulate, thoughtful and coherent."  Response at 6.

In support of his argument, Balotin cites one case, from the Second Circuit Court of Appeals, for the proposition that the "[d]enial of the opportunity to use such forceful impeaching material bearing on the credibility of the government's key witness mandates a new trial."  See id. at 20, n. 4 (citing United States v. Pacelli, 491 F.2d 1108, 1119 (2d Cir. 1974)).  However, aside from the fact that Pacelli is not binding on this Court, Balotin ignores the important fact that the government's failure to disclose the "forceful impeaching material bearing on the credibility of the government's key witness" in Pacelli, was a violation of its obligations under the Jencks Act.[27] See Pacelli, 491 F.2d at 1118-19.  Here, Balotin makes no suggestion of a Jencks Act violation.  He does not claim that the Government improperly withheld any statement or documents, nor does he even contend that the information was known to the Government or that the statements or documents existed pretrial.  He cites no authority supporting the proposition that evidence of a witness's memory issues and substance abuse discovered post-trial, absent the Government's withholding of such information, would

---

[27]   The Jencks Act, 18 U.S.C. § 3500, requires that after a witness has testified on direct examination, the government must provide the defendant with any "statement" of the witness "which relates to the subject matter as to which the witness has testified."

warrant a new trial.  Thus, the interests of justice do not require a new trial based on Dr. Kohn's report.

### C. Motion for Mistrial

Balotin also argues that the Court erred in denying his motion for mistrial which was based on the Government's intention to elicit testimony regarding Balotin's pre-arrest silence in its case in chief.  Motion at 28-30.  The Government argues that the Court properly denied Balotin's motion for mistrial because the Eleventh Circuit Court of Appeals has held that "a defendant's pre-arrest silence may be elicited in the Government's case in chief or where a defendant chooses not to take the stand, as Balotin did."  Response at 6-7 (citing United States v. Cabezas-Montano, 949 F.3d 567, 595 (11th Cir. 2020).

Early in the presentation of evidence, Balotin moved for a mistrial based on a prosecutor's question which he asserts sought to elicit testimony of his pre-arrest silence in the Government's case in chief.  Id. at 28.  In the Motion, Balotin "recognize[s] that binding Eleventh Circuit precedent, articulated in Rivera [], allows the Government to 'comment on a defendant's silence if it occurred prior to the time that he is arrested and given his Miranda[28] warnings.'"  Id. at 29 (citing Rivera, 944 F.2d at 1568).  Nevertheless, Balotin

---

[28]     Miranda v. Arizona, 384 U.S. 436 (1966).

contends that <u>Rivera</u> was wrongly decided and is inconsistent with decisions of other circuits.  See <u>id.</u> at 29-30.[29]

As a preliminary matter, the Court notes that the Eleventh Circuit's holding in <u>Rivera</u> is still good law.  See <u>Cabezas-Montano</u>, 949 F.3d at 595; <u>see also United States v. Mulet</u>, 729 F. App'x 697, 702 (11th Cir. 2018) (finding district court did not err in denying defendant's motion for mistrial based on the government's comment regarding the defendant's pre-arrest and pre-<u>Miranda</u> silence); <u>see also United States v. Wilchcombe</u>, 838 F.3d 1179, 1190 (11th Cir. 2016).  And "unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by [the Eleventh Circuit] sitting <u>en banc</u>," it is binding precedent for this Court.  See <u>United States v. Deshazior</u>, 882 F.3d 1352, 1355 (11th Cir. 2018) (internal citation and quotation omitted).  Regardless, although Balotin states that "the government's intentional decision to elicit in its case in chief the fact of Mr. Balotin's silence violated his

---

[29]     Specifically, Balotin states that "several judges in this Circuit have signaled their strong disagreement with <u>Rivera</u>." Motion at 29-30 (citing <u>United States v. Wilchcombe</u>, 838 F.3d 1179, 1193 (11th Cir. 2016) (Jordan, J., concurring) and <u>United States v. Alexander</u>, 713 F. App'x 919, 926 (11th Cir. 2017) (unpublished and per curiam)).  However, in <u>Wilchcombe</u>, Judge Jordan commented on the portion of <u>Rivera</u> which found that the government can comment on a defendant's <u>post-arrest</u> silence when it occurs before <u>Miranda</u> warnings are given.  <u>Wilchcombe</u>, 838 F.3d at 1193 (citing <u>Rivera</u>, 944 F.2d at 1568).  In <u>Alexander</u>, the court similarly was commenting on the portion of <u>Rivera</u> foreclosing the argument that "the government's use of his <u>post-arrest</u>, pre-<u>Miranda</u> silence violated his Fifth Amendment rights to due process and against self-incrimination."  713 F. App'x at 926 (emphasis added).  Here, it was testimony regarding Balotin's <u>pre-arrest</u>, pre-<u>Miranda</u> silence, which the Government sought to elicit.

Fifth Amendment right to silence," he appears to acknowledge that no such testimony was actually presented to the jury. <u>See</u> Motion at 30. Indeed, the relevant testimony from Jacksonville Sheriff's Office Detective Charles Bennett was as follows:

> Q     So after you had that conversation and had been out to the pharmacy, did you contact Scott Balotin at some point to hear his side of the situation?
>
>> A     Yes ma'am.
>
>> Mr. Rashbaum:     Objection, Your Honor.
>
>> The Court:     There is not a question.
>
>> Mr. Rashbaum:     Okay.
>
>> The Court:     All right. He answered whether he had a conversation with Mr. Balotin. Next question.
>
> By Ms. Hackenberry:
>
> Q     And was that in the normal course of your investigation to follow up on that?
>
>> A     Yes ma'am.
>
> Q     And did you ask Mr. Balotin if he would speak with you?
>
>> A     Yes ma'am.
>
>> Mr. Rashbaum:     Objection, Your Honor.
>
>> The Court:     Basis?
>
>> Mr. Rashbaum:     Fifth Amendment right.

The Court:        Let me see counsel at sidebar.

Transcript of Jury Trial (Volume I) (Charles Bennett) (Doc. 595; Det. Bennett Tr.) at 124-125.   Detective Bennett never testified that Balotin refused his request to speak with him pre-arrest or at any other time.    Thus, the Government did not elicit testimony of Balotin's pre-arrest silence, and even if it had, it would have been permissible under binding Eleventh Circuit precedent.   Accordingly, Balotin is not entitled to a new trial on this basis.

**D.  Weight of the Evidence as to Count Twelve**

With regard to his conviction on the money laundering charge in Count Twelve, Balotin contends that he should receive a new trial for two reasons. Motion at 30-31.   First, he argues that because his conviction as to Count Twelve is based on Count One, "[a] new jury might well acquit Mr. Balotin on Count One and thereafter also acquit him on Count Twelve on the grounds that Mr. Balotin neither received nor transferred proceeds of a specified unlawful activity."   Id. at 30.   Second, Balotin argues that his conviction on Count Twelve is against the weight of the evidence because the subject of the charge is a transfer to a joint account held by him and his wife and there is no evidence that he, as opposed to his wife, engaged in the transaction.   Id. at 31-32.   Balotin states

> Where, as here, the subject of a Section 1957 charge is a transfer to
> a joint account held by a husband and wife, a "conviction for money
> laundering pursuant to §1957 cannot stand" where there was no

evidence that the charged spouse, as opposed to the uncharged spouse, engaged in the alleged monetary transaction.

Id. at 32 (citing United States v. French, 748 F.3d 922, 936 (9th Cir. 2014)). Although Count Twelve includes an aiding and abetting theory of liability Balotin argues there is no proof to support it.  Id. at 32-33.

First, for the reasons discussed above, the Court finds that Balotin is not entitled to a new trial as to the health care fraud conspiracy charge in Count One.  As such, his argument that he is entitled to a new trial on Count Twelve if the Court grants a new trial on Count One, is unavailing.  Second, in French, which is the only authority Balotin cites in support of his argument regarding the weight of the evidence, the Ninth Circuit reversed the defendant's conviction on two counts of money laundering under very different circumstances.  See French, 748 F.3d at 936.  With regard to one count, the court found that the woman's "conviction should be reversed because there was no evidence that she, as opposed to her husband, engaged in a monetary transaction relating to the purchase of this truck."  Id.  In doing so, the court noted that the only evidence pertaining to that count demonstrated that the husband bought the truck and that "he alone signed the transaction documents."  Id.  The court held that

> [b]ecause the government has not pointed to any evidence from which a rational trier of fact could infer that [the woman] knowingly engaged in a monetary transaction involving criminal property in

- 82 -

purchasing the pickup truck, her conviction for money laundering pursuant to § 1957 cannot stand.

Id.  As to the second count, the court determined that the funds at issue were transferred directly into an account held <u>exclusively</u> in the husband's name.  <u>Id.</u> at 937.  "Notably, there [wa]s no evidence in the record indicating that [the woman] had access to this account, let alone that she personally transferred money into it, knowing the funds to be the proceeds of unlawful activity."  <u>Id.</u>

Here, Agent Peter Corigliano testified that he followed payments made to Scott Balotin by Park and King Pharmacy into different financial accounts under his control.  <u>See</u> Corigliano Tr. at 117-19; <u>see also</u> Government's Exhibit 12B.  Specifically, Scott Balotin was paid $430,680.20 by Park and King on December 31, 2014, which was then deposited into a SunTrust account that Balotin owned as tenants by the entirety with his wife on January 2, 2015.  <u>See</u> Corigliano Tr. at 59.  A few days later, on January 6, 2015, $300,000 was withdrawn from the SunTrust account, <u>see</u> Government's Exhibit 12B, and deposited into an USAA account also owned by Mr. Balotin and his wife, <u>see</u> Government's Exhibit 12A at 6; <u>see</u> <u>also</u> Corigliano Tr. at 117-19.  Agent Corigliano testified that Scott Balotin had control over the accounts in which the funds were transferred.  Corigliano Tr. at 117-18.  Thus, unlike in <u>French</u>, there is no evidence that Ellen Balotin is the one who engaged in the transaction described in Count Twelve, that she exclusively controlled any of the accounts,

or that Scott Balotin did not have access to any of the accounts. That Ellen Balotin also had access or joint control over the accounts at issue does not "preponderate so heavily against the jury's verdict" such that it constitutes a "miscarriage of justice." United States v. Almanzar, 634 F.3d 1214, 1222 (11th Cir. 2011) (internal citations and quotations omitted) ("If the record establishes that the evidence did not 'preponderate so heavily against the jury's verdict' as to lead to a 'miscarriage of justice,' we will conclude that the district court afforded too little deference to the jury's verdict and exceeded its authority by granting a new trial."). Having considered the evidence adduced in this case, the Court cannot conclude this case is one of those "really exceptional cases" where a new trial should be granted based on the weight of the evidence. See Martinez, 763 F.2d at 1313.

## III.   Conclusion

Having considered all of Balotin's arguments, the Court concludes that he has failed to show that the interest of justice warrants a new trial. The record does not support his belatedly raised claim that the Government's filing of notices of lis pendens on his family's properties prevented him from retaining counsel of his choice in violation of the Sixth Amendment. And his trial specific arguments in support of his request for a new trial are unavailing. As such, the Motion will be denied.

In light of the foregoing, it is

**ORDERED**:

Defendant Scott Balotin's Motion for New Trial (Doc. 621) is **DENIED**.

**DONE AND ORDERED** at Jacksonville, Florida on February 28, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

lc28

Copies to:
Counsel of Record