## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA,**

                                        Case No.: 3:19-CR-191-MMH-MCR-1

vs.

**SCOTT BALOTIN et al.,**

          Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

Defendant, Scott Balotin, by and through the undersigned counsel moves this Honorable Court to dismiss his indictment with prejudice based vast and outrageous prosecutorial misconduct.  The prosecutorial misconduct this case spans years, involved multiple prosecutors, and has infected nearly every aspect of this case.

Mr. Balotin recognizes that he was afforded a new trial following a Consent Joint Motion for New Trial Based on Newly Discovered Evidence. See Docs. 800 and 803.  He maintains that this new trial does not alleviate the prejudice he continues to suffer as a result of the prosecutorial misconduct, and that he, and his counsel, always planned to file this Motion to Dismiss.  Mr. Balotin's former counsel so informed the Court that they planned to file a Motion to Dismiss despite the new trial and sought a limited appearance to do so. Doc. 838 at p. 4-6); Doc. 816.  As Mr. Balotin is now docketed for his retrial, it is appropriate for the Court to review the totality of the government's misconduct and dismiss the indictment.

<u>Statement of Misconduct</u>

I.    <u>Prosecutorial Misconduct During the Grand Jury</u>

The United States, by and through then AUSA Julie Hackenberry, presented false and misleading testimony to the grand jury on several points, and this evidence helped it secure an indictment. The most flagrant false and misleading testimony related to an alleged "dead patient" for whom prescriptions were written and billed to Tricare.

Ms. Sonsoles "Soni" Simsur testified before the grand jury on October 31, 2018. Exhibit 1. At the time she had been convicted in a separate fraud scheme unrelated to Mr. Balotin. She testified that Mr. Balotin was aware that prescriptions were being written by Dr. Samuel Kulick for "patients that were dead" and that "the prescription had been going through for a couple months and it was paying a really high amount." Exhibit 1 at p. 16-17. She testified that the "dead patient" prescriptions were filled by Carter's pharmacy and were adjudicated and paid for by "Tricare or whatever insurance company was paying out." Id. Similar testimony was elicited by Hackenberry from Simsur at trial:

> Q. Were there some issues with prescriptions for children on occasion?
>
> A. Correct. There were -- there was a particular time where I was at CasePark -- I'm sorry, at Greg Carter's pharmacy and Scott was there.
>        And Kulick, Dr. Kulick, was very upset that -- calling Scott that, "Hey, you got a prescription for a child," or a dead patient, "and the prescription has been filled for a couple of months, and now we've got to fix this issue," stuff

> like that.
>
> Q. And those prescriptions that -- the ones for the dead
> person or for the children, were those adjudicated and paid out
> by TRICARE; do you know?
>
> A. The one for the dead patient had been adjudicated for
> several months, and they had called Dr. Kulick's office because
> Dr. Kulick's son worked at the time in the office as an office
> manager for Dr. Kulick. And he had - - (objection by defense)

Tr. at p. III-21.   The Court then sustained a hearsay objection and the line of questioning stopped.  Hackenberry and AUSA Mai Tran then used the "dead patient" in their arguments to the jury. Tr. at p. XI-2651, 2743 (Tran argued "There was a dead person getting insurance billed for creams.").

The problem for the United States is that Hackenberry and her lead agent (IRS Criminal Investigations Special Agent Peter Corigliano) were well aware prior to Simsur's testimony before the grand jury that, while there was a patient who died (identified as Helen Eastwood[1]), there was no evidence that prescriptions were filled and claims adjudicated for Ms. Eastwood following her death; in other words, Tricare had never paid any money for a "dead patient's" creams.   An email between Hackenberry and Corgiliano on September 10, 2018 demonstrates this knowledge:

---

[1] An online obituary indicates a Helen Eastwood of Atlantic Beach, Fl died December 2, 2013 (https://www.legacy.com/us/obituaries/timesunion/name/helen-eastwood-obituary?id=9698690).

*From* Corigliano Peter J<Peter.Corigliano@ci.irs.gov>
*To*     Hackenberry, Julie (USAFLM), ThomasColalillo@fdle.state.fl.us
*Sent* Monday, September 10, 2018, 5:44 PM EDT   Sent
Monday, September 10, 2018, 5:44 PM EDT
Received
Monday, September 10, 2018, 5:46 PM EDT
Archived
Monday, September 10, 2018, 6:11 PM EDT
*Size* 407.7 KB   ▭▭

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

Hey Julie,

I went through Carter's phone and pulled out the Dr. Kulick texts. They discuss the dead patient. The patient was Helen Eastwood. You will see in the text messages that Kulick claims to have written the script in Dec 2013. We don't have records for 2013. Carter says they tried to fill a newly written script on May 7, 2014. Kulick claims he did not write the new script. Carter says they called the patient and found out she was deceased. I do not see any TRICARE claims in Quickbase for Eastwood, but clearly this dead patient incident did happen as we were told.

Of interest, the text messages referenced by Corigliano do not provide that Dr.

Kulick said he wrote the script in December 2013, only when Ms. Eastwood was alive:

Carter

We have a Rx for a Helen Eastwood .we called to let her know we were sending it. The person that answered the phone said she died Dec. of 2013.
The Rx is from your office .Are you familiar with this patient? Help

Kulick

I have no idea what that's all about. I may have written a script for her when she was alive , but I thought that the only way she could get a refill is if she requested it.

4

As Corigliano notes in his email, they had all of the records related to claims for 2014, and found no claims adjudicated for Ms. Eastwood.  This is further bolstered by another email from Corigliano to Hackenberry dated October 17, 2018 wherein he discussed his review of all the prescriptions written by Dr. Kulick and filled at Carter's Park and King Pharmacy:

*From*  Corigliano Peter J<Peter.Corigliano@ci.irs.gov>
*To*     Hackenberry, Julie (USAFLM), kevin.haines@jaxsheriff.org, ThomasColalillo@fdle.state.fl.us
*Sent* Wednesday, October 17, 2018, 4:31 PM EDT  Sent
Wednesday, October 17, 2018, 4:31 PM EDT
Received
Wednesday, October 17, 2018, 4:33 PM EDT
Archived
Wednesday, October 17, 2018, 5:02 PM EDT
*Size* 89.7 KB      ▭▭

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

Hey Julie,

I looked into the timeframe of claims under Dr. Kulick and Park & King.  I did not locate any TRICARE claims for Dr. Levy in Quickbase.  The total amount for Dr. Kulick was $2,175,311.79.  The timeframe of the claims was 03/03/2014 thru 04/13/2015.  Soni only dealt with Dr. Kulick and P&K on the front-end, but the relationship continued for a while afterwards.  I attached the Quickbase records.  Almost every claim was tied to Balotin/CasePark until the very end.  Password:  Corigliano#22

Pete

In addition to reviewing all of the Quickbase records (the internal tracking system for adjudicated prescriptions at Carter's Park and King Pharmacy) and not identifying any claims for Ms. Eastwood, the government had obtained from Tricare

in May 2018 a list of all prescriptions submitted by Carter's Park and King Pharmacy to Tricare for adjudication.[2]  No prescriptions for Helen Eastwood appear on this list.

Thus prior to October 31, 2018 (Simsir's grand jury testimony) and September 10, 2021 (Simsir's trial testimony), the United States was well-aware that Simsur's allegations about Mr. Balotin profiting from prescriptions filled for a "dead patient" by Carter's pharmacy and adjudicated by Tricare were patently false.  Yet, at both critical stages of this case, the United States elicited the false testimony from its witness.

The government also permitted Soni Simir's husband's lies during the grand jury to go uncorrected.  On March 14, 2014, Celep Simsir testified that his wife was paid by Mr. Balotin via checks issued by CasePark. Exhibit 3 at p. 26.  This was of course important because the government painted CasePark as the epicenter of the fraud.  However, the government had subpoenaed CasePark's bank records in 2016 from SunTrust Bank including all checks written on the account and there were zero checks written to either Simsir or her husband. Details from these same financial records are mentioned in several search warrants attested to by Corigliano. Additionally, at trial, Simsir testified that Mr. Balotin "never paid" her but she was eventually paid by Carter, which was why she stopped working for Mr. Balotin. Tr. at p. II-303.

---

[2] This spreadsheet was provided in discovery as Bates IRS-036667.  The metadata provides that it was created by Tamara Marks from DoD OIG on May 22, 2018. Exhibit 2.

Further, the government left certain statements of the law by Detective Charles Bennett of the Jacksonville Sherriff's Office go uncorrected.  For example, Bennett testified that "Florida state law" required any sales representatives for a pharmacy must be "hired by that pharmacy and be a W-2 employee." Exhibit 4 at p.7.  The undersigned has researched the Florida Statutes and has not found any laws, though the undersigned is aware of the "safe harbor" under the federal anti-kickback statute for W-2 employees.

Bennett also testified before the grand jury on August 6, 2015 that Keith Elliott was getting prescriptions that cost $160,000 per month. Exhibit 4 at p. 29.  A review of all claims submitted to Tricare for Kieth Elliott show that the aggregate of claims for Elliott and his wife together never came close to $160,000 per month.  The total claims reflected by Tricare as reflected in the government's own spreadsheet were close to $80,000 per month. Exhibit 5.  This perjured exaggeration by Bennett was not unique to him; many other witnesses exaggerated or misstated facts that went uncorrected by the prosecutor, and Mr. Balotin can more fully develop this during an evidentiary hearing.

While this may seem self-evident, the government may not rely on perjured testimony to secure an indictment before the grand jury. *See, e.g., Anderson v. Secretary for Dept. of Corrections*, 462 F.3d 1319, 1324 (11th Cir. 2006).  The court in *Anderson* held that such action is a violation of due process and prosecutorial misconduct:

> due process is violated if a prosecutor permits a defendant to be tried upon an indictment which he or she knows is based on perjured, material testimony without informing the court, opposing counsel, and the grand jury. This policy is predicated

on the belief that deliberate deception of the court and the jury by the presentation of evidence known by the prosecutor to be false "involves[s] a corruption of the truth-seeking function of the trial process," *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976), and is "incompatible with `rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972) (citation omitted). Moreover, deliberate deception is inconsistent with any principle implicit in "any concept of ordered liberty." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), and with the ethical obligation of the prosecutor to respect the independent status of the grand jury. Standards For Criminal Justice § 3-3.5, 3-48-4-49 (2d ed.1980); *United States v. Hogan*, 712 F.2d 757, 759-60 (2d Cir.1983); [*People v. Pelchat*, 62 N.Y.2d 97, 476 N.Y.S.2d 79, 464 N.E.2d 447, 453 (1984)] (the "cardinal purpose" of the grand jury is to shield the defendant against prosecutorial excesses and the protection is destroyed if the prosecution may proceed upon an empty indictment).

*Id.* Further, in Mr. Balotin's case, it is the cumulative impact of the falsehoods and misrepresentations made that impaired the grand jury's integrity as an independent body and are unconscionable.

The story of the "dead patient" may be the most material and aggravating aspect of the evidence against Mr. Balotin. Second to that was the amount of money billed per prescription, which was grossly exaggerated and misrepresented before the grand jury. The government's flagrant acts in eliciting and not correcting this testimony justify a finding of prosecutorial misconduct and dismissal of the indictment.

II.   The "Inadvertent" Failure to Disclose David Stevens's Cooperation in the Southern District of Georgia.

On September 28, 2023, by letter, the United States informed Mr. Balton's counsel that impeachment information about government witness David Stevens "was inadvertently not previously disclosed." Exhibit 6. Coincidentally, that date is the same date that Stevens filed his own Sentencing Memorandum informing the Court

(and anyone with Pacer access) of the full extent of his cooperation with federal prosecutors and law enforcement. Doc.781 ("In addition to the cooperation referenced in the 5k1 Motion and above, Stevens also substantially assisted law enforcement and prosecutors in a Southern District of Georgia case against a local pain clinic (Coastline Physical Medicine and Rehabilitation) by providing grand jury witness testimony and meeting with DEA and other law enforcement agents on multiple occasions (including twice for trial witness testimony preparation) which ultimately resulted in guilty pleas for unlawful dispensations of controlled substances (USA v. Messbarger, et al. – U.S. District Court for the Southern District of Georgia Case No. 2:2019-cr-00050).").

The information about Stevens related to his cooperation in the Southern District of Georgia (SDGA), the Middle District of Florida, the State of Florida, and the Drug Enforcement Agency (DEA). Records provided indicate that Mr. Stevens began cooperating in 2017 after he was identified as running an opioid "pill mill" and, of critical importance, told the DEA that he "would do anything to stay out of jail and to remain with his family." Exhibit 7. The extent of his cooperation, his criminal involvement in the "pill mill" for which he was never charged by federal prosecutors, and his specific statements about the lengths he was willing to go to not to go to jail clearly were material to his credibility as a witness against Mr. Balotin.

Evidence "favorable to the accused" under *Brady v. Maryland*, 373 U.S. 83 (1963) encompasses both exculpatory evidence and impeachment evidence, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, "[t]he government has

a duty to disclose evidence of any understanding or agreement as to prosecution of a key government witness." *Brown v. Wainwright*, 785 F.2d 1457, 1464 (11th Cir. 1986). The reason for such disclosure is "to ensure that the jury knows the facts that might motivate a witness in giving testimony." *Id.* at 1465 (quotation omitted).

The Justice Department itself acknowledges its duty to seek all exculpatory and impeachment evidence, take a broad view of materiality, and err on the side of disclosing exculpatory or impeaching evidence. Justice Manual, 9-5.001 (last updated January 2020). And during the very pendency of this case, Congress directed that Federal Rule of Criminal Procedure 5 be amended to remind prosecutors of their obligations under *Brady* and its progeny. See Due Process Protection Act, P.L. No. 116-182, 134 Stat. 894 (Oct. 21, 2020) [3].

Despite the characterization of the failure to disclose as "inadvertent," the very prosecutors and special agent that spent nearly three weeks in trial with Mr. Balotin in fall 2021 all had actual knowledge of Stevens's cooperation in the SDGA and with the DEA. Emails conveyed Stevens's cooperation in the SDGA and with the DEA to the entire prosecution trial team as early as November 20, 2020 up until the days before Mr. Balotin's trial commenced. Exhibit 8.

The conduct by the United States is aggravated by the fact there was extensive pretrial litigation over such favorable materials and it made repeated assurances to

---

[3] Presumably the Court could pursue criminal contempt proceedings against the prosecutors for violation of the Court's order at Doc. 250.

counsel and the Court that it had and would continue to comply with its constitutional duty to disclose favorable evidence. See, e.g., Docs. 208, 210, 211. Further, the prosecutors provided a "*Brady / Giglio*" disclosure on September 21, 2021 but failed to mention Stevens's cooperation in the SDGA and with the DEA and the leniency he was receiving despite emailing about it four days earlier on September 17, 2021. See Doc. 800-2; exhibit 8. This type of cooperation that resulted in Stevens not being prosecuted for operating a pill mill is exactly the same type of impeachment evidence that the United States Supreme Court addressed in *Giglio v. United States*, 405 U.S. 150 (1972); in other words, this was *Giglio* material on its face.

Even more troubling, Stevens testified at trial for the United States and was explicitly asked about his cooperation and hope for a lesser sentence by Hackenberry on direct examination, a common prosecutor tactic to undermine cross examination by defense counsel. Tr. at p. V-198-99. This shows that even she recognized that cooperation and leniency were material to Stevens's credibility and would have been effective cross-examination material. But, she only asked Stevens about his cooperation against Mr. Balotin and his co-defendants and never mentioned his extensive cooperation in the SDGA and with the DEA that had led to leniency in that district and for which he hoped to receive leniency from Hackenberry and this Court.

There can be also no dispute about the materiality of this information. First, it directly goes to Stevens's credibility and desire to receive leniency. The emails by Stevens's counsel make clear that Stevens's believed he should receive leniency at his

sentencing before this Court as a result of his cooperation in the SDGA and with the DEA. Second, there was substantial overlap between Balotin's case and the SDGA case such that it would be entirely unreasonable to believe that one was not connected with another. Dr. Messbarger and the Coastline Physical Medicine and Rehabilitation clinic in St. Mary's, Georgia were involved in both the SDGA case and Balotin's case. Dr. Messbarger reportedly wrote numerous prescriptions for compounded medications that were filled by Carter's Park and King Pharmacy. In fact, Dr. Messbarger and the Georgia clinic were mentioned at least 85 times during the trial and Stevens testified extensively about both. See, e.g., Tr. at p. V-273-75.

The United States clearly violated its discovery obligations by withholding favorable and material evidence known to it regarding Stevens that would have been used by Mr. Balotin at trial. And, such evidence was only disclosed after it became apparent that Stevens's intended to inform this Court of the extent of his cooperation in the SDGA and with the DEA in hopes of receiving leniency from the Court. The government's failure was not "inadvertent[]."

This Court's order pursuant to the Due Process Protection Act entered on December 2, 2020 warned the United States that failing to timely disclose favorable evidence could result in a litany of sanctions including dismissal. Given the degree of knowledge and the stage at which this information was disclosed, combined with the other acts by the prosecution, this Court should dismiss the indictment with prejudice.

III.    <u>Jeremiah Bezroukoff's Mental Health and Substance Abuse Issues.</u>

Similar to the revelation regarding Stevens, Mr. Balotin discovered that government witness Jeremiah Bezroukoff claimed mental health issues that affected his memory and substance abuse issues only after Bezroukoff filed his Motion Downward Departure with the Court disclosing such issues on November 18, 2021. Exhibit 9.  Despite the government's assertions that no one "on the prosecution team was aware of Mr. Bezroukoff suffering from <u>any of those things mentioned in the November 3 report</u>" (Exhibit 10), Mr. Balotin later discovered that the United States was aware of this information as early as first appearance and clearly by June 8, 2020[4] when it received Bezroukoff's initial Presentence Investigation Report (PSR)[5] that detailed his PTSD and abuse of cocaine, ecstasy, and alcohol during periods relevant to his alleged participation in the conspiracy with Balotin. Doc. 900.  Additionally, a comparative analysis of Bezroukoff's Pretrial Services Report and PSR show that Bezroukoff made false statements to Pretrial Services claiming "no history of illegal substance abuse" yet this specific instance of untruthfulness was not disclosed by the United States.  All of this information, known well before Mr. Balotin's trial, was not

---

[4] Bezroukoff also mentioned his mental health issues during his change of plea colloquy where Hackenberry represented the United States. See Doc. 890.

[5] Mr. Balotin was only provided the revised PSR, which was issued following his trial. However, the initial PSR was prepared June 8, 2020 and it is logical to assume the information alleged herein was contained in the initial PSR.  Should the United States dispute that this information was in the initial PSR, Mr. Balotin would request production by the Court of the initial PSR.

disclosed by the United States at any point but discovered by Mr. Balotin through due diligence and motions filed with the Court. Doc. 890.

In denying Mr. Balotin's Motion for a New Trial, this Court found that Mr. Balotin had not claimed, let alone showed, that the government was aware of Mr. Bezroukoff's issues prior to Mr. Balotin's trial. Doc. 698 at p. 77-78.  Of course, the government in its response did not acknowledge that it held such information prior to trial nor did it correct the Court after it issued its order. Doc. 622.  This is a clear instance of lack of candor to the Court by the government because we now know the government had knowledge of both Bezroukoff's mental health and substance abuse issues prior to trial.

The evidence withheld by the government was material and violated Mr. Balotin's due process.  Prior acts of untruthfulness may be used as impeachment at trial. Fed. R. Evid. 608(b).  Additionally, the mental state of a witness is relevant and may be the focus of cross-examination, and the medical documentation of a witness's mental state may likewise be relevant. *See, e.g., United States v. Lindstrom*, 698 F.2d 1154, 1167 (11th Cir. 1983) (holding that while the "privacy interest of a patient in the confidentiality of her medical records and the societal interest in encouraging the free flow of information between patient and psychotherapist" are important, these interests "are not absolute and, in the context of this criminal trial, must 'yield to the paramount right of the defense to cross-examine effectively the witness in a criminal case.'");  *United States v. Partin*, 493 F.2d 750, 762 (5th Cir. 1974) (holding "the readily

apparent principle is that the jury should, within reason, be informed of all matters affecting a witness's credibility to aid in their determination of the truth" and that a witness's "ability to comprehend, know, and correctly relate the truth" is relevant and admissible).

Bezroukoff was, perhaps, the most damaging witness to Mr. Balotin at his trial. He detailed the inner workings of the CasePark marketing team and testified that Mr. Balotin was aware that patients and doctors were being paid in exchange for writing and receiving compounded medication prescriptions. Tr. at p. VI/B-108.  In fact, this Court gave his testimony great weight when reviewing Mr. Balotin's claim that the Court erred when it gave the deliberate ignorance instruction. Doc. 698 at p. 69, 72, 74.  Yet the prosecutors concealed that Bezroukoff suffered from mental health issues and substance abuse issues and had previously lied to court officials about his substance abuse. This information was all the more important because Bezroukoff demonstrated convenient memory loss during Mr. Balotin's cross examination at trial with respect to compliance training and discussions with Mr. Balotin on how to legally conduct marketing efforts. Tr. at p. VI/B-111-114.  In other words, Bezroukoff could remember what the government wanted him to testify about but could not remember things favorable to Mr. Balotin.

The United States knew of several issues regarding Bezroukoff's credibility prior to trial and failed to disclose the information prior to trial, then denied knowing about

it, and, in fact, has never disclosed it.[6]  Moreover, the government left this Court's assessment of when the government became aware of the issues with Bezroukoff go uncorrected.  The jury was entitled to know about these credibility issues and the government in so many ways persisted in undermining the rudimentary demands of justice.  The government's actions warrant dismissal of the indictment with prejudice.

IV.   The *Lis Pendens* Flip-flopping and Illegal Seizing of Substitute Assets.

United States Attorneys have extraordinary power.  They are the enforcement arm of the Executive Branch in criminal courts.  They have the utmost responsibility to ensure that justice is done, to uphold the law, and to act with integrity. *Berger v. United States*, 295 U.S. 78,88 (1935).  Here, the United States flip-flopped, acted with improper intent, and violated federal and state law with respect to placing lis pendens on the Balotin real property[7].

The indictment in this case includes a forfeiture allegation in which the government contended that, through his participation in the charged offenses, Mr. Balotin obtained at least $2,527,373.37 in criminal proceeds. Doc. 1.  The allegation did not identify any specific real or personal property of Mr. Balotin's alleged to constitute or be traceable to criminal proceeds of any offense charged in the indictment.

---

[6] Mr. Balotin acknowledges that the United States did not oppose his motion for in camera review of the pretrial services and presentencing reports, after which the Court did disclose impeaching materials as outlined in this motion.

[7] With the exception of Kesley Lane, the properties are not titled in Mr. Balotin's name.

On November 14, 2019, the day of Mr. Balotin's arrest, the government filed a Bill of Particulars in which it stated its intent to criminally forfeit–as substitute assets– seven real properties[8] tied to Mr. Balotin or his family. Doc. 28.  Within days, the government filed and recorded with the appropriate state county clerk's office Notices of *Lis Pendens* for each of the seven properties. Docs. 29, 63, 65-69.  Weeks later, on December 13, 2019, the government filed another Bill of Particulars and Notice of *Lis Pendens*, identifying an eighth real property it said it also intended to seek as a substitute asset.[9] Docs. 139, 141.  Title to seven of the eight properties is (and was) held by trusts of which Mr. Balotin's wife and/or children are beneficiaries.  Had the government's restraint of those properties been released pretrial, Mr. Balotin's wife and children would have given him access to funds from the sale of those properties to assist him in retaining counsel and mounting his defense.

As the prosecutors well knew, the recording of these lis pendens in November and December 2019 made it impossible for the real properties to be sold or encumbered because they clouded the title, despite the absence of any claim by the government that the properties constituted or were traceable to proceeds of any charged criminal offense.  Any doubts about either the government's knowledge of that fact or its specific intent to foreclose any efforts to sell the Balotin properties were extinguished

---

[8] Those seven real properties are 1133 West Kesley Lane, 2984 Myra Street, 2678 Ernest Street, 5831 Begonia Road, 4056 Jammes Road, 3698 Jammes Road, and 2319 Eudine Drive.

[9] The eighth property is 5839 Cedar Oaks Drive.

during the hearing on November 22, 2019, when Hackenberry, discussing the government's recording of the original lis pendens in the context of a conversation about Mr. Balotin's need for money to pay for an attorney, stated that the government had placed "the lis pendens on the property [*sic*] in order to *stop them from being sold* so that the government would be in a position at the end of the case, if the defendant is convicted, to be able to recoup some of the money that was taken during the fraudulent scheme." Doc. 571 at p. 8 (emphasis added).  Hackenberry went on to state that Mr. Balotin was "going to have to find some way to get other money to hire an attorney . . . [b]ut those lis pendens will not be lifted." Id.  Of course, this assertion by Hackenberry directly contradicted established principles of constitutional law that a defendant has a Sixth Amendment right to liquidate substitute assets to pay for counsel and confused Mr. Balotin who was still appearing pro se. *See Luis v. United States,* 578 U.S. 5 (2016).

Thereafter, over a series of status of counsel conferences, a litany of exchanges occurred between Mr. Balton, Hackenberry, and the Court regarding whether the real property named in the Bill of Particulars were directly traceable (aka "tainted") assets or were substitute (aka "untainted") assets for possible forfeiture if tainted assets were not available upon conviction, with the government making different representations to the Court, though its filing to date only claimed that the real property were substitute assets.  These exchanges that occurred between November 14, 2020 are March 4, 2020 are well-documented in the pleadings related to Mr. Balotin's Motion for a New Trial.

18

Docs. 621 and 676.  What is clear by the record is that Mr. Balotin sought to liquidate or encumber the real property to fund his legal defense, and that the government strenuously objected and represented to the Court and Mr. Balotin that it would not let that happen.  This culminated in Mr. Balotin, during a status conference on March 4, 2020, informing the Court and the United States of his intent to retain one of the leading attorneys in the country to litigate the lis pendens via a limited appearance and perhaps doing so pro bono. Doc. 649 at 30.  However, that never happened.

Despite having investigated the case for years (the grand jury first began hearing the case in August 2015), on March 5, 2020, the United States flip-flopped its original position and filed an Amended Bill of Particulars alleging all eight properties were directly traceable assets, thereby evading litigation that would release the lis pendens under *Luis*. Doc. 179.

The government thereafter maintained for more than 18 months that the eight real properties at issue were assets directly traceable to the alleged healthcare fraud, effectively preventing their sale or encumbrance to fund Mr. Balotin's defense and scaring off any attorney who may have been tempted to assist Mr. Balotin in litigating the lis pendens. See exhibit 11 (Attorney Howard Srebnick, who represented Luis before the Supreme Court, wrote to Mr. Balotin, it "looks like the government [is] putting lawyers on notice that anybody who takes those properties is taking tainted

funds (even if there is no restraining order) and may face litigation later.")[10].

Temporally, the government's first change in position (declaring the properties directly

forfeitable rather than as substitute assets) remained unchanged until after the

commencement of trial.   Indeed, on October 11, 2021, in the midst of trial, the

government flip-flopped again, conceding both at sidebar and in a Second Amended

Bill of Particulars that the eight real properties were *not* tainted, and therefore would

be pursued only as substitute assets, exactly how Hackenberry had described initially

described the properties with respect to forfeiture law in the November 2019 hearing.

Doc. 484; Tr. at p. XII-13-14.

     While this Court thoroughly examined Mr. Balotin's claim that the

government's actions pretrial with respect to the Balotin real property violated his

Sixth Amendment right to choice of counsel in its Order on Mr. Balotin's Motion for

New Trial (Doc. 698), this Court did not address the propriety of the government's

actions.   In fact, the Court's Order on his Sixth Amendment claim rested on its finding

that Mr. Balotin failed to challenge the government's Bill of Particulars and filing of

the lis pendens and failed to demonstrate the lack of other assets to retain his counsel

of choice. Doc. 698 at 54.   The Court did express "significant concerns regarding

whether the lis pendens at issue in this case were properly filed under Florida law while

the properties were classified as substitute assets." Doc. 698 at 15-16.   Mr. Balotin

---

[10] *See United States v. Monsanto*, 491 U.S. 600, 615-616 (2014) (holding that property traceable
or involved in the crime is forfeitable and not available to pay legal costs).

asserts that the government's actions with respect to the properties throughout this case until the lis pendens were released on October 16, 2023 were an illegal seizure that violated his Fifth Amendment due process rights, that the properties, including Kesley Lane, were never traced by the government until the eve of trial at which point the government realized it could not establish that the properties directly traceable[11], and that the government made false representations to the Court that such assets had been directly traced to the proceeds from the charged offenses. Exhibit 12.

The Eleventh Circuit has accepted that "lis pendens have the practical effect impeding an owner's ability to sell property, particularly at its (unrestricted) market value." *United States v. Register,* 182 F.3d 820, 836 (11th Cir. 1999). In *Register*, a case involving directly traceable assets, the court held that "a filing of a lis pendens <u>pursuant to state statute</u> does not constitute a 'seizure' and does not affect property interests to an extent significant enough to implicate the Due Process Clause of the Fifth Amendment." *Id.* at 834, 837 (emphasis added). In reaching that conclusion, the *Register* court relied on *Kirby Forest Indus., Inc. v. United States* wherein the Supreme Court found that "impairment of market value of real property incident to otherwise <u>legitimate</u> government action ordinarily does not result in a taking." 467 U.S. 1, 15 (1984) (emphasis added). Thus, both courts recognized that the government must be

---

[11] <u>If the government objects to this assertion</u>, Mr. Balotin requests that the government be ordered to produce all evidence of tracing on the properties.

acting legitimately and pursuant to the law when they file a notice of lis pendens to avoid a Fifth Amendment violation.

Here, Mr. Balotin asserts that the government's filing of the lis pendens against substitute assets was not pursuant to Florida state law and that it was not legitimate at any point – even after the government declared the assets were directly traceable – because the government had not directly traced the property to the charged offenses.

Between November 14, 2019 and March 5, 2020, and then from October 11, 2021 until October 26, 2023, the government illegally restrained the Balotin real property when they filed lis pendens against substitute assets in violation of Florida and federal law. *See United States v. Osmany Diaz*, 17-20631-cr-Scola/Goodman, Doc. 443 (S.D. Fla. Oct. 26, 2023), *citing United States v. Rivera, et al.,* 22-cr-20552, 2023 WL 4363544, Doc. 75 (S.D. Fla. July 6, 2023) and cases cited therein (finding that neither federal nor Florida law authorize the government to file lis pendens on substitute assets)[12].  Thus, the lis pendens were not legitimate government action nor pursuant to Florida statute.  Rather, they were an illegal taking of his and his family's property and did in fact interfere with their ability to sell the properties at 4056 Jammes Road and 5839 Cedar Oaks Drive.  The family had executed contracts to sell these properties in October and early November 2019. See exhibit 13. Of course, after the lis pendens were filed, the buyer walked away.  Regardless of whether the Court reaches the

---

[12] The Chief, Asset Recovery Division for the U.S. Attorney's Office for the Middle District of Florida has acknowledged the holding of these cases applies to Mr. Balotin's properties by letter to Ellen Balotin's attorney. Exhibit 14.

conclusion that the government's actions in fact violated Mr. Balotin's Fifth Amendment, the government still violated Florida and federal law and impeded his and his family's ability to sell property by maintaining lis pendens against substitute assets.

More concerning were the government's repeated claims[13] and filing of the Amendment Bill of Particulars naming all eight properties as directly traceable when it knew that it had not traced (and perhaps could not trace) the assets to the charged criminal activity.  Of particular note is the Kesley Lane property which was purchased on April 30, 2014 for $708,252 by wire transfer.  The indictment charged that the conspiracy began on or about May 2014 (Doc. 1), but a review of Mr. Balotin's banking records that were subpoenaed in 2016 established that he did not receive his first payment from Park and King Pharmacy until May 16, 2014 (Doc. 709 at p. 10), so the Kesley Lane property could not have been purchased with proceeds from the charged criminal conduct.

Emails show the government was scrambling to establish tracing on the eve of trial. Exhibit 12.  In fact, emails show the government could not trace the Kesley Lane home to the charged offenses, which is the definition of tainted property (that directly

---

[13] At least as early as December 5, 2019 the government told the Court that they had traced the properties to the offenses. Transcript of December 5, 2019 Status Conference, Exhibit 15 at p. 7. And during the hearing on March 4, 2020, the government made the same representation. Doc. 649 at 32 (Hackenberry told the Court, "I guess Mr. Rashbaum after my response to him explaining how the properties were purchased with fraud proceeds, that we would not be in a position to lift the lis pendens, I guess that he's now out of the case.")

linked the proceeds of an offense of conviction) under 21 U.S.C. § 853 as incorporated by 18 U.S.C. § 982. Yet they still filed pleadings with this Court asserting they had legal grounds to file lis pendens and probable cause that the properties were traceable.

The illegal actions and false claims by the government with respect to the forfeitability of the real properties in the face of representations that Mr. Balotin and his family needed access to the properties to obtain counsel and fund his defense are of the worst kind. Lis pendens were illegally placed and maintained on assets that the government knew or should have known were innocent (at minimum, Kesley Lane). The government made repeated false statements to the Court that the assets had been traced to the charged offenses, which they had not. Federal prosecutors have the utmost responsibility to ensure that justice is done, to uphold the law, and to act with integrity. Here, it is clear the prosecutors intentionally violated the law and Mr. Balotin's constitutional rights.

<u>Conclusion</u>

Mr. Balotin recognizes that he already received a new trial and that "[d]ismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized." *United States v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987) (quotations omitted). But if dismissal was not an available sanction, neither this Court in its Due Process Protections Act order or other courts would mention it as an available sanction for prosecutorial misconduct. Here, there are repeated violations of different kinds that started at the very inception of the case with testimony before the

grand jury and persisted to the eve of what was supposed to be Mr. Balotin's sentencing. It spanned more than 8 years (August 2015 to September 2023) and involved several prosecutors.

The prosecutorial misconduct has actually prejudiced Mr. Balotin and his family in many ways. Mr. Balotin maintains that he was denied and continues to be denied his Sixth Amendment right to counsel. His properties were illegal seized, preventing their sale. His wife has now had to declare bankruptcy. Exhibit 16. He has been under the supervision of Pretrial Services for nearly five years. He likely would have been acquitted at his original trial with the impeachment information for Stevens and Bezroukoff.

WHEREFORE, Mr. Balotin respectfully requests this Court hold an evidentiary hearing on this matter and thereafter dismiss his indictment with prejudice.

Respectfully submitted,

*/s/* **Patrick K. Korody**
Patrick K. Korody, Esq.
Florida Bar No. : 0107361
118 W. Adams Street, Suite 500
Jacksonville, FL 32202
Telephone: (904) 383-7261
Facsimile: (904) 204-9548
Email: patrick@korodylaw.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on **September 10, 2024**, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/* **Patrick K. Korody**
Patrick K. Korody, Esq.